No. 16-1693

# In the
# United States Court of Appeals
# for the Seventh Circuit

SHERRY ANICICH, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille,

*Plaintiff - Appellant,*

v.

HOME DEPOT U.S.A., INCORPORATED, GRAND SERVICE LLC, and GRAND FLOWER GROWERS, INCORPORATED,

*Defendants - Appellees.*

Appeal From The United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 14-CV-07125
The Honorable Judge Jorge L. Alonso

**BRIEF OF APPELLANT**

Kristin Nicole Barnette
KRALOVEC, JAMBOIS & SCHWARTZ
60 W. Randolph
4th Floor
Chicago, IL 60601
(312) 782-2525

Jason M. Metnick
MELTZER, PURTILL & STELLE LLC
300 S. Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 987-9900

**ORAL ARGUMENT REQUESTED**

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS

Appellate Court No: 16-1693

Short Caption: Anicich v. Home Depot, USA Inc., et. al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sherry Anicich, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kralovec, Jambois & Schwartz

Meltzer, Purtill & Stelle LLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: /s/ Kristin N. Barnette Date: September 30, 2016

Attorney's Printed Name: Kristin N. Barnette

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes X No ____

Address: Kralovec, Jambois & Schwartz, 60 W. Randolph, 4th Floor, Chicago, IL 60601

Phone Number: 312-782-2525 Fax Number: 312-855-0068

E-Mail Address: KBarnette@kjs-law.com

rev. 01/08 AK

Appellate Court No: 16-1693

Short Caption: Anicich v. Home Depot, USA Inc., et. al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sherry Anicich, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Meltzer, Purtill & Stelle LLC

Kralovec, Jambois & Schwartz

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: /s/ Jason M. Metnick Date: September 30, 2016

Attorney's Printed Name: Jason M. Metnick

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes X No ____

Address: Meltzer, Purtill & Stelle, LLC, 300 South Wacker Dr., Suite 2300, Chicago, IL 60606

Phone Number: 312-987-9900 Fax Number: 312-987-9854

E-Mail Address: jmetnick@mpslaw.com

rev. 01/08 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ........ i

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

REQUEST FOR ORAL ARGUMENT ........ vii

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED FOR REVIEW ........ 2

STATEMENT OF THE CASE ........ 2

A. Relevant Procedural History ........ 2

B. Relevant Facts: Grand and Home Depot Help Make a Murderer. ........ 4

1. Grand and Home Depot Were Aware of Cooper's Sexual Harassment, Inappropriate Physical Touching, and Verbal Abuse At Home Depot's Joliet Store. ........ 5

2. Grand and Home Depot Were Aware of Cooper's Violent and Cruel Behavior, and His Verbal Abuse at Home Depot's Shorewood Store. ........ 7

3. Grand and Home Depot Assisted Cooper To Travel Alone With Alisha, Stay In The Same Room, And Falsify Work Attendance Records Through A "Clocking In and Out Scheme." ........ 9

4. Alisha Reports Cooper's Conduct; Grand and Home Depot Do Nothing. ........ 9

5. Grand Directs Cooper To Undertake An Anger Management Course, But Then Permits Him Not To Complete The Course. ........ 10

6. Cooper Kills and Sexually Abuses Alisha While She Is "Clocked In" at Work. ........ 11

SUMMARY OF ARGUMENT ........ 12

ARGUMENT ........ 13

I. The Amended Complaint Satisfies Federal Pleading Standards And States Facts That Plausibly Put Grand and Home Depot On Notice That Their Employee Would Likely Harm Alisha Such That They Owed Her A Duty. ........ 13

A. Cooper's Attack On Alisha Was Reasonably Foreseeable and Likely. ........ 15

B. It Places No Additional Burden On Grand and Home Depot To Guard Employees Against An Abusive, Violent Co-

Employee, and The Consequences Of Placing Such A Burden On Them Would Result In A Responsible Work Environment.........25

II. The Employers Owed Alisha A Duty To Protect Her, Because They Knew That Cooper Would Attack Alisha By Luring Her From Work. ....... 26

III. Grand and Home Depot Knew That Cooper Was Unfit To Supervise Alisha, Which Put Her At Danger; The Amended Complaint Stated A Claim For Negligent Supervision. .......... 30

CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE .......... 33

CIRCUIT RULE 30(d) STATEMENT .......... 34

CERTIFICATE OF SERVICE .......... 35

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 14

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ........ 14

*Blue v. St. Clair Country Club,*
7 Ill.2d 359 (1955) ........ 19

*Doe v. Brouillette*,
389 Ill.App.3d 595 (1st Dist. 2009) ........ 31

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005) ........ 19

*Forseth v. Vill. of Sussex*,
199 F.3d 363 (7th Cir. 2000) ........ 15

*GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*,
64 F.3d 1112 (7th Cir. 1995) ........ 15

*Hills v. Bridgeview Little League Ass'n*,
745 N.E.2d 1166 (Ill. 2000) ........ 22

*Hooper v. County of Cook*,
366 Ill.App.3d 1 (3d Dist. 2006) ........ 20

*In re Kmart Corp.*,
381 F.3d 709 (7th Cir. 2004), *cert denied*, 543 U.S. 1056 (2005) ........ 13

*Kolupa v. Roselle Park Dist.*,
438 F.3d 713 (7th Cir. 2006) ........ 19

*LaFever v. Kemlite Co.*,
185 Ill.2d 380 (1998) ........ 20

*Lang v. TCF Nat. Bank*,
249 F. App'x 464 (7th Cir. 2007) ........ 15

*Lavalais v. Vill. of Melrose Park*,
734 F.3d 629 (7th Cir. 2013) ........ 13

*Lewis v. Razzberries, Inc*,
584 N.E.2d 437 (Ill. App. Ct. 1991) ........ 22

*Marshall v. Burger King Corp.*,
222 Ill. 2d 422 (2006) ........ 19

*Osborne v. Stages Music Hall, Inc.*,
312 Ill. App. 3d 141 (2000) ........ 27

*Petersen v. U.S. Reduction Co.*,
641 N.E.2d 845 (Ill. App. Ct. 1994) ........................................................ 27

*Platson v. NSM, Am., Inc.*,
322 Ill.App.3d 138 (2d Dist. 2001) .......................................................... 31

*Rapier v. Ford Motor Co.*,
49 F.Supp.2d 1078 (N.D. Ill. 1999) .......................................................... 31

*Reynolds v. CB Sports Bar, Inc.*,
623 F.3d 1143 (7th Cir. 2010) ........................................ 15, 20, 22, 23, 25, 28, 29

*Rivera v. Garcia*,
401 Ill.App.3d 602 (2010) ........................................................................ 20

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) .................................................................................. 14

*Shortall v. Hawkeye's Bar & Grill*,
283 Ill.App.3d 439 (1st Dist. 1996) .......................................................... 23

*Simpkins v. CSX Transp. Inc.*,
965 N.E.2d 1092 (Ill. 2012) ...................................................................... 22

*Swanson v. Citiban, N.A.*,
614 F.3d 400 (7th Cir. 2010) ..................................................................... 15

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) ................................................................... 14

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .................................................................................. 15

*Thompson v. Gordon*,
241 Ill.2d 428 (2011) ................................................................................ 20

**Statutes**

28 U.S.C. Sec. 1291 ...................................................................................... 1

28 U.S.C. Sec. 1332 ...................................................................................... 1

735 ILCS 5/2-615 ......................................................................................... 22

Fed. R. Civ. Proc. 12(b)(6) .......................................................................4, 13

**Other Authorities**

Restatement (Second) of Agency § 512(1) (1958) ........................................... 27

**Rules**

Fed. R. App. P. 34(a) ..................................................................................... vii

Fed. R. Civ. Proc. 8(a) .............................................................................14, 21

Fed.R.Civ.P. 9(b)........................................................................................... 19

## REQUEST FOR ORAL ARGUMENT

Oral argument is appropriate in this case under the criteria of Fed. R. App. P. 34(a) because this case is not frivolous; the dispositive issues have not been authoritatively decided; and the decisional process would be aided by oral argument.

# JURISDICTIONAL STATEMENT

This matter is a civil negligence case for which the United States District Court for the Northern District of Illinois had jurisdiction pursuant to 28 U.S.C. Sec. 1332. Plaintiff filed her complaint in Circuit Court of Cook County, Illinois. (Dkt.#1-1)[1] Plaintiff sought an amount in excess of $75,000 and was representing the estate of her deceased daughter, Alisha Bromfield, and deceased granddaughter, Baby Ava Lucille, both citizens of Illinois. Defendant Home Depot U.S.A, Inc. is a Delaware corporation with its principle place of business in Georgia. (Dkt.#1) Defendant Grand Service LLC, is a Michigan limited liability company with its principle place of business in Michigan. (Dkt.#1) Grand Service, LLC has three members: John Mossel, Todd Mossell and Steve Mulder. John Mossel, Todd Mossel and Steve Mulder are all Michigan citizens. (Dkt.#57) Defendant Grand Flowers, Inc. is a Michigan corporation with its principal place of business in Michigan. (Dkt.#1) Vinca Solutions, Inc, a dismissed defendant, is an Indiana corporation with its principal place of business in Michigan. (Dkt.#1) Defendants removed this case from the Circuit Court of Cook County, Illinois to the Northern District of Illinois. (Dkt. #1)

This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1291 and 28 U.S.C. 1332. The United States District Court for the Northern District of Illinois entered an order granting Defendants' Motions to Dismiss without prejudice on March 11, 2016, and a final order dismissing the case with prejudice on April 4, 2016. Plaintiff filed a timely Notice of Appeal on March 28, 2016 pursuant to Federal Rules of

---

[1] Citations to the record appear as Dkt.#.

Appellate Procedure 3(a) and 4(a)(2). No issues or parties remain before the District Court.

## ISSUES PRESENTED FOR REVIEW

1. Was it reasonably foreseeable that Grand and Home Depot's employee, Brian Cooper, would continue his pattern of sexual harassment, verbal abuse, inappropriate touching and violent manners toward young women, and harm decedent Alisha Bromfield, such that Plaintiff stated a claim for negligence?

2. Did Grand and Home Depot have a duty to protect Alisha Bromfield from supervision by and travel with her supervisor, knowing that he had a violent temperament and had lured a young woman from work and sexually harassed Alisha Bromfield, such that Plaintiff stated a claim for negligence?

3. Did Plaintiff state a claim for negligent supervision, given Grand and Home Depot knew their employee was unfit to supervise Alisha Bromfield and he posed a danger to her?

## STATEMENT OF THE CASE

### A. Relevant Procedural History.

Plaintiff, Sherry Anicich, as Independent Administrator of the Estate of Alisha Bromfield, deceased, and as Special Administrator of the Estate of Baby Ava Lucille, deceased, filed civil claims against Home Depot U.S.A., Inc. d/b/a Home Depot, John Mossel and Todd Mossel, each individually and each d/b/a Grand Service LLC and each d/b/a Grand Flower Growers, Inc. (collectively, "Grand"), and each d/b/a Vinca Solutions LLC in the Circuit Court of Cook County of Illinois Law Division on August 11, 2014. Dkt#1-1. On September 12, 2014, Grand removed this action to the United States District Court for the Northern District of Illinois. Dkt#1. Following removal, Home Depot filed two Motions to Dismiss Plaintiff's Complaint Pursuant to FRCP 12(b)(6) (Dkt#14, 16), followed by Grand's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(6)(Dkt #19)

and Vinca Solutions' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(B)(6)(sic). Dkt#38.

On June 9, 2015, Honorable Jorge L. Alonso denied one of Home Depot's motions to dismiss, and granted the three remaining motions to the dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt.#60). The complaint was dismissed because Hon. Alonso believed that all four factors used to determine whether a duty ran from Defendants to Plaintiff weighed against Defendants owing a duty to protect Alisha from being murdered by Defendants' employee. Dkt.#60.

Plaintiff timely filed an amended complaint (Appx, A-13.)[2] Thereafter, the District Court granted Plaintiff's oral motion to dismiss voluntarily defendants Vinca Solutions, LLC, John Mossel and Todd Mossel. Dkt.#72. The amended complaint included substantially more facts and further developed the originally-filed state court pleading to cure deficiencies, comply with applicable legal authority and meet the federal notice pleading standard. Grand, however, filed a Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt.#67), shortly followed by Home Depot filing a Motion to Dismiss Plaintiff's Amended Complaint Pursuant to FRCP 12(b)(6). Dkt.#69. Similar to their first motions to dismiss, Defendants argued the amended complaint did not plead facts showing that Alisha's murder was reasonably foreseeable (Dkt.#69 ¶3) and that Defendants owed no duty to Alisha. Dkt#67, p.3.

Plaintiff sought leave to conduct discovery in response to Defendants' motions to dismiss the amended complaint. Dkt.#72. The District Court denied

2 References to the Appendix appear as Appx.

Plaintiff's request to take discovery, which was stayed pending resolution of the motions to dismiss. *Id.*

On March 11, 2016, Hon. Jorge L. Alonso issued his memorandum opinion and entered an order granting both motions to dismiss pursuant to F.R.C.P. 12(b)(6). (Appx, A-1—A-12) Although recognizing Defendants knew of their employee's unprofessional conduct, repeated sexual harassment and verbal abuse of young women, angry temperament in throwing items in Home Depot, failure to complete anger management, and a scheme that permitted him to leave the work site with Alisha while still "clocked in," the District Court decided the ninety-three paragraph amended complaint had not sufficiently permitted a "reasonable inference that Cooper's attack on [Alisha] Bromfield was reasonably foreseeable." Appx, A-7. The District Court dismissed Plaintiff's amended complaint without prejudice and allowed Plaintiff until April 1, 2016 to file a motion seeking leave to file a second amended complaint. Appx, A-11. On April 4, 2016, final judgment was entered dismissing the amended complaint with prejudice. Dkt.#84. This appeal followed.

March 30, 2016, Plaintiff filed a timely notice to appeal the District Court's decision to grant Defendants' motions to dismiss the amended complaint pursuant to F.R.C.P. 12(b)(6). Dkt. #80. Plaintiff seeks to reverse the District Court's decision to grant Defendants' motions to dismiss the amended complaint and remand the case for trial.

### B. Relevant Facts: Grand and Home Depot Help Make a Murderer.

Alisha Bromfield was sixteen years old when she began working for Grand Flower Growers, Inc., Grand Service LLC and Home Depot at the Home Depot

store locations in Shorewood, Bolingbrook and Joliet, Illinois. Appx, A-15, ¶14. At these Home Depot stores, Alisha assisted customers, provided garden services, tended to flowers and set up price signs and displays. *Id.* Alisha worked seasonally for Home Depot and Grand from 2006 until August of 2012, until their employee, Brian Cooper, murdered her. *Id.*

Alisha was directly supervised by Cooper, the Regional Manager of Grand and jointly employed by Home Depot and Grand. Appx, A-15, ¶¶11-14. Cooper was in charge of Grand's business operations and employees at Home Depot garden center facilities throughout Northern Illinois, including hiring and firing all "merchandisers", including Alisha. Appx, A-15 ¶13. Home Depot controlled who it hired and retained, including companies working on Home Depot's premises. Home Depot was also in charge of the garden center and overall job site safety for work being performed there. *Id.* Home Depot was also responsible for overall job site safety of its employees. *Id.*

### 1. Grand and Home Depot Were Aware of Cooper's Sexual Harassment, Inappropriate Physical Touching, and Verbal Abuse At Home Depot's Joliet Store.

While working at Home Depot in Joliet, Alisha reported to Cooper and to the group leader, Kelly Elwell. Appx, A-16, ¶17. Elwell was aware of Cooper's inappropriate conduct towards young female employees and his violent behavior. *Id.* For example, in 2007, Jessica (Watts) Boseo, Alisha's coworker, began working at Home Depot Joliet upon completing high school. *Id.* at ¶18. Cooper directly supervised Jessica and made references to his penis, introduced Jessica as his girlfriend, and physically rubbed himself against her. *Id.* at ¶19. Cooper commanded

Jessica to accompany him to different Home Depot locations under the pretense that other female employees would accompany them. *Id.* at ¶20. When Jessica got into his car, however, Cooper drove straight to downtown Chicago without picking up any other employees. *Id.* Cooper continued making explicit comments about his genitals while Jessica was trapped in the seat next to him. *Id.* Upon arriving in Chicago, Cooper took his fantasy further and introduced Jessica as his girlfriend, despite Jessica's disgust and protests. Appx, A-16, ¶20.

Upon her return to work at Home Depot Joliet, Jessica informed Kelly Elwell of Cooper's inappropriate conduct during that trip and how uncomfortable it made her. Appx, A-17, ¶21. In response, Elwell revealed to Jessica that other co-workers had made similar complaints of Cooper and that even she (Elwell) felt uncomfortable working around Cooper. *Id.* Nevertheless, Cooper continued to work at Home Depot and his conduct became increasingly loud and abusive *Id.* ¶22 Cooper would yell and swear at Jessica in front of Home Depot customers. *Id.* Jessica became increasingly apprehensive about the work environment at Home Depot Joliet, culminating in her quitting because she was too afraid of Cooper, who swore and yelled at her even when she quit by phone. *Id.* ¶¶22, 23. Cooper's behavior toward Jessica is one example of several other similar circumstances, which were known to Elwell and others at both Grand and Home Depot. *Id.* at ¶24.

Cooper threatened, verbally abused, and sexually harassed Alisha. Appx, A-17, ¶¶25, 26. As with Jessica, Cooper directly supervised Alisha and all three of them worked with Home Depot group leader, Kelly Elwell. Appx, A-15, ¶13, A-16, ¶17. Cooper similarly began an abusive pattern toward Alisha: on at least two occasions

Cooper called Alisha a "bitch" while they were both in the company of Home Depot Joliet customers and fellow employees. Appx, A-7, ¶26. Alisha was threatened by and scared of Cooper, and begged Elwell, "Don't leave me with him." *Id.* at ¶27. Alisha further complained to Elwell that Cooper would falsely call Alisha his "girlfriend." *Id*. Despite Alisha's pleas for help, Home Depot and Grand permitted Cooper to retain his position of authority and to continue to supervise and control Alisha's work conditions and employment status. Appx, A-17, ¶28.

Cooper slammed items around the Joliet store in fits of rage. Appx, A-18, ¶29. Although Cooper was sent home from work due to this violent outburst when he threw items in Home Depot, Cooper was never removed from supervising Alisha, or stripped of his authority for verbally abusing and sexually harassing Alisha. Appx, A-18, ¶30. Defendants permitted Cooper to control Alisha's work conditions at Home Depot Joliet, and he retained authority to terminate Alisha's employment. *Id.*

### 2. Grand and Home Depot Were Aware of Cooper's Violent and Cruel Behavior, and His Verbal Abuse at Home Depot's Shorewood Store.

Alisha could not escape Cooper's abusive conduct even when working at the Home Depot Shorewood location. Appx, A-18, ¶32. Tina Clem was a manager at Home Depot's Shorewood store while Alisha worked there. *Id.* Clem became aware of Cooper's inappropriate and abusive conduct, including his cruel and violent behavior directed toward Alisha. *Id.* One summer afternoon, while Alisha worked outside in temperatures exceeding 100 degrees, Alisha asked Cooper for a break. *Id.* at ¶32. Cooper denied Alisha's request despite the excessive heat conditions. *Id.* Clem observed Alisha crying and visibly upset when Cooper denied her request for a break, so Clem told Cooper that Alisha needed to take that break. *Id.* at ¶33. Cooper

also denied Alisha's requests for breaks if she was going to be accompanied by a male for her lunchbreak. *Id.* at ¶33.

Cooper abused his control over Alisha's work conditions and schedule. *Id.* at ¶34. Cooper publicly berated Alisha, calling her a "slut" and "whore," when she asked him for a day off. *Id.* He screamed demeaning and wildly inappropriate names at Alisha in front of Home Depot Shorewood customers and fellow employees. Appx, A-18, ¶34. Following this outburst, Mark Hanouw, Store Manager at Home Depot Shorewood, instructed Clem to send Cooper home because of his conduct towards Alisha. *Id.* at ¶35. As Cooper exited the store as directed, he continued to scream at Alisha and another female employee and then continued to harass them with text messages into the night. *Id.*

Cooper's aggressive conduct became increasingly apparent and worrisome to Clem when Cooper found out Alisha was pregnant with another man's child. Appx, A-19, ¶36. Clem noticed Cooper's demeanor change towards Alisha. *Id.* Clem witnessed Cooper stew angrily in the patio section of Home Depot Shorewood after hearing the news. *Id.* His antics continued and concerned Alisha's co-worker at Home Depot Shorewood, sparking the co-worker to warn Alisha and others that Cooper's treatment towards Alisha constituted sexual harassment. *Id.* Cooper's sexual harassment was tolerated at Home Depot stores, and Alisha's repeated complaints about his aggressive conduct and unwelcome advances fell on deaf ears at Grand and Home Depot. Appx, A-20, ¶39.

**3. Grand and Home Depot Assisted Cooper To Travel Alone With Alisha, Stay In The Same Room, And Falsify Work Attendance Records Through A "Clocking In and Out Scheme."**

Grand and Home Depot knew that Cooper demanded Alisha to accompany him on "business trips" as a rouse to engage in abusive and inappropriate conduct with Alisha. Appx, A-21, ¶46. Defendants' employees facilitated Cooper to be alone with Alisha by having Alisha's work attendance "clocked in and out" when Alisha went on mandatory trips with Cooper. Appx, A-20, ¶40. Cooper even required Alisha to sleep in the same room as him for an overnight "business trip," and these arrangements were known to Grand and Home Depot employees, group leaders and representatives. Appx, A-21, ¶46.

**4. Alisha Reports Cooper's Conduct; Grand and Home Depot Do Nothing.**

Cooper's abusive and inappropriate conduct continued relentlessly throughout Alisha's employment at Home Depot Joliet and Home Depot Shorewood, as it had for Jessica at Home Depot Joliet. Appx, A-19, ¶37. Alisha complained to Grand management about Cooper's conduct on multiple occasions. *Id*. She reported to Grand management that Cooper openly suggested that she should have an intimate relationship with him, because he could spend time with her as her work supervisor. *Id*. Alisha told Grand's management that Cooper's advances were unwelcome and unwanted. Appx, A-19, ¶38. Cooper frequently text messaged, called and contacted Alisha under the false pretense of work-related issues to intimidate Alisha to respond to his communications. *Id*. He used this tactic to monitor her life outside of work and manipulate Alisha into spending time alone with him. *Id*. Alisha complained about this harassment to Grand management,

including the group leader at Home Depot Shorewood, going so far as to specifically request not to be left alone with Cooper. *Id*. Yet, neither Grand nor Home Depot management took any meaningful action to protect Alisha. *Id*.

When Alisha complained to Grand management about Cooper's aggressive conduct, unwelcomed advances and outrageous outbursts at work, *both* Grand management *and* Home Depot management simply told Alisha they were already aware of Cooper's anger problems and violent propensities. Appx, A-20, ¶39. Fully aware of Cooper's past and knowing Cooper had angry and violent propensities, neither Grand nor Home Depot took steps to protect Alisha from Cooper's conduct. *Id*. Cooper's control over Alisha was left unchecked, and even exacerbated due to the employees, group leaders, and managers at Grand and Home Depot who assisted Cooper to be alone with Alisha by arranging to have Alisha's work attendance clocked in and out while Alisha traveled with Cooper at his demand. Appx, A-20, ¶40.

### 5. Grand Directs Cooper To Undertake An Anger Management Course, But Then Permits Him Not To Complete The Course.

While Cooper was Alisha's supervisor, Grand ordered Cooper to undertake an anger management course. Appx, A-20, ¶¶41, 42. Cooper failed to comply, and confronted his human resources manager about this requirement, which resulted in Cooper being ordered to attend additional anger management classes. Appx, A-21, ¶42. Regardless, Grand and Home Depot failed to require Cooper to complete anger management classes, or to ensure that there had been any progress in the management of his behavior and anger towards Alisha and other employees - which

was the reason Cooper was ordered to obtain anger management counseling. Appx, A-21, ¶¶42-43.

Grand and Home Depot allowed Cooper to retain his supervisory position over young female employees, including Alisha. Appx, A-21, ¶43. This enabled Cooper to wield unchecked authority over Alisha's work hours and work conditions, and to maintain his unfettered discretion to terminate Alisha. Appx, A-21, ¶45.

#### 6. Cooper Kills and Sexually Abuses Alisha While She Is "Clocked In" at Work.

Cooper's final tragic acts against Alisha began with his routine abuse of authority. In the summer of 2012, Cooper repeatedly asked Alisha, then nearly seven months pregnant, to go with him to his sister's August wedding. Appx, A-22, ¶49. Alisha refused twice. *Id.* Angry and unwilling to accept this rejection, Cooper threatened to reduce Alisha's work hours or fire her if she refused to go with him. Appx, A-22, ¶50. Cooper arranged for Alisha to be "clocked in" at work if she went with him. Appx, A-22, ¶52. Alisha, about to become a young mother supporting a child as a single parent, could not afford to lose her job or take a pay cut, so she succumbed to Cooper's coercion and agreed. Appx, A-22, ¶51, A-23, ¶54. On Friday, August 18, 2012, Cooper told Alisha not to go into work and had arranged for Alisha to be "clocked in" by a team leader through the Home Depot landline phone at the Home Depot premises where Alisha was scheduled to work, so Alisha would still be paid while grudgingly accompanying Cooper. Appx, A-22, ¶52.

After the wedding, Alisha declined Cooper's suggestion that they have a permanent relationship, which unleashed Cooper's rage. Appx, A-23, ¶53. Cooper wrapped his hands around Alisha's neck for five minutes or more as she begged for

her life and that of her unborn baby, until he was left holding her lifeless body. *Id.* Cooper then proceeded to rape her heavily pregnant corpse. *Id.* Alisha and her unborn baby, Ava Lucille, were both dead. Appx, A-23, ¶54.

## SUMMARY OF ARGUMENT

### I.

The District Court erred in ruling that Grand and Home Depot did not owe Alisha a duty of care. It was reasonably foreseeable and likely that Cooper would harm her, and it would have imposed no undue burden on Grand and Home Depot to remove Cooper's authority over Alisha. The District Court disregarded well-established pleading standards by imposing a higher fact pleading standard and conducting a merit-based analysis inappropriate for a 12(b)(6) motion to dismiss. The amended complaint contains facts that plausibly suggest Grand and Home Depot owed a duty to Alisha under the circumstances of this case.

The District Court based its decision on an incomplete factual record improperly weighing theories of liability and without drawing reasonable inferences in favor of Plaintiff. Given the nature of the legal claims and the heavy fact-based situation, dismissal of Plaintiff's negligence claims was premature. Nevertheless, Plaintiff set forth many facts detailing why Plaintiff's negligence claim is plausible.

### II.

Grand and Home Depot had a duty to protect Alisha in the scope of her employment. Alisha was in imminent danger under Cooper's supervision: he lured women away from work using a "clocking in" scheme while he simultaneously threatened an adverse employment action if they refused to go with him.

## III.

Grand and Home Depot negligently supervised and retained Cooper in a supervisory capacity over Alisha. Cooper was particularly unfit for his position and placed Alisha in danger so long as Cooper retained control over her employment conditions.

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed *de novo*. Under a *de novo* standard of review this Court owes no deference to the trial judge's interpretation of the law, nor is deference owed to the trial court's reading of the rules. Claim construction in a complaint is an issue of law which this Court also reviews *de novo*. When the *de novo* standard of review is applied, this Court uses the same rule of law and regulation of decision as the trial judge was required to use in the first instance. *In re Kmart Corp*., 381 F.3d 709, 712 (7th Cir. 2004), *cert denied*, 543 U.S. 1056 (2005). "We review *de novo* a Rule 12(b)(6) dismissal for failure to state a claim." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). Under a *de novo* standard of review, the issues in this case are considered anew and this Court gives no weight to the trial judge's decisions.

### I. The Amended Complaint Satisfies Federal Pleading Standards And States Facts That Plausibly Put Grand and Home Depot On Notice That Their Employee Would Likely Harm Alisha Such That They Owed Her A Duty.

Grand and Home Depot (the "Employers") knew Cooper had a history of sexual misconduct and violence toward female subordinate employees, including Alisha. Yet, they failed to do anything to prevent Cooper from exercising his authority over Alisha and harm her. A complaint alleging negligence, such as

Plaintiff's amended complaint, must meet the liberal pleading standard under Rule 8(a) of the Federal Rules of Civil Procedure, which requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citing Rule 8(a)(2) and *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). This standard is met so long as the complaint "is sufficient to provide the defendant with fair notice of the claim and its basis." *Id.*

A complaint defeats a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). This facial plausibility test of Rule 8 merely requires the plaintiff to plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; it does not require that the plaintiff's theory by "at least as compelling" as the defendant's explanation. *Id*. To require a plaintiff's theory to be as or more likely than alternatives would raise, if not exceed, Rule 8's pleading standard and would contradict both *Twombly* and *Iqbal* insofar as both decisions state that Rule 8 still applies the "plausibility standard" and does not establish a probability test. The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility;" thus, "a well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Iqbal*, 556 U.S. at 677 (quoting *Twombly*, 550 U.S. at 570); *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Lang v. TCF Nat. Bank*, 249 F. App'x 464,

466 (7th Cir. 2007); *accord Swanson v. Citiban, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010) (the court will ask itself *could* these things have happened, not *did* they happen.).

Three principles guide the court in determining whether a complaint meets the Rule 8 plausibility standard. First, the court must take the plaintiff's factual allegations as true. *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). Second, the facts set forth in the complaint are viewed "in the light most favorable to the nonmoving party." *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995). Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible. *Cf. Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

In turn, to impose a legal duty on a defendant for a criminal attack, the court must consider whether the attack was reasonably foreseeable, the likelihood of injury, the burden on the defendant of guarding against that injury, and any consequences of placing the burden of the duty on the defendant. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1151 (7th Cir. 2010).

### A. Cooper's Attack On Alisha Was Reasonably Foreseeable and Likely.

The District Court found that "it can be inferred that [D]efendants knew that Cooper had sexually harassed and verbally abused [Alisha] and another female employee, had angrily thrown items in the store, and had failed to complete an anger management course that he had been directed to complete." Appx, A-7. Yet, the District Court held Plaintiff to an additional burden of pleading "that Cooper had been physically violent to Bromfield or anyone else prior to the murders or had

threatened violence." Appx, A-8. Plaintiff submits that reported sexual harassment, verbal abuse, throwing items at a workplace, and failing to complete anger management classes are sufficient indications that Cooper would commit sexual and violent acts against Alisha. Cooper was a grenade ready to explode, and the Employers knew it.

Although federal pleading standards do not require it, Plaintiff's amended complaint provides a remarkably detailed set of facts and witness accounts of Cooper's sexual harassment and violent behavior at Home Depot's garden centers. As pled in the amended complaint, Kelly Elwell, Tina Clem and Mark Hanouw all knew that Cooper was a violent sexual deviant. Appx, A-13—A-32. Elwell, Clem and Hanouw held positions of supervisory authority and shared work environments with Alisha and Cooper in Joliet and Shorewood Home Depots. They all knew that Cooper exhibited improper sexual and/or violent behaviors toward Alisha, as well as towards her co-worker, Jessica Boseo.

At Home Depot Joliet, Cooper's sexually inappropriate behavior toward Jessica, Alisha's co-worker, occurred while Alisha worked there, and in a strikingly similar manner. Kelly Elwell was a team leader in a supervisory position employed at Home Depot Joliet. Jessica told Elwell about Cooper's unwanted sexual advances, inappropriate touching, and forced secluded trips with him. Elwell revealed that other employees had made similar complaints and that she too felt uncomfortable working around Cooper. Yet, Cooper was permitted to continue to supervise Jessica, at whom he swore and yelled. Alisha similarly complained to Elwell that Cooper called her a "bitch," and begged Elwell not to be left with him. Shockingly, despite

the Employers' direct knowledge of Cooper's inappropriate sexual conduct and abuse of occupational power over female employees, they simply did nothing about it.

At Home Depot Shorewood, Cooper was cruel and verbally abusive toward Alisha, and violent. Tina Clem was the Home Depot Shorewood Manager, and Mark Hanouw was the Store Manager of Home Depot Shorewood. Clem and Hanouw knew Cooper was violent, because they sent him home for throwing items around the store. Thereafter, Grand instructed Cooper to get anger management counseling, presumably because they wanted him not to act violently toward employees and customers. Further, Clem witnessed Alisha upset and crying after Cooper forced her to work in temperatures over 100 degrees without a break. Cooper was known to publicly call Alisha a "slut" and "whore" if she asked for a day off. Despite Cooper's known misconduct, Grand and Home Depot let him continue to supervise Alisha without restriction and without completing anger management counseling.

The facts of this case paint a disturbing picture showing it was plausible and predictable that Cooper would harm Alisha, a female subordinate. Yet, the District Court identified only three inferences it could derive from the amended complaint: Defendants knew (1) that Cooper sexually harassed and verbally abused [Alisha and Jessica]"; (2) that Cooper "had angrily thrown items in the store"; and (3) that Cooper "had failed to complete an anger management course that he had been directed to complete." (Appx, A-7), However, the District Court summarily limited itself to these three inferences from the ninety-three (93) paragraphs of allegations in

the amended complaint. (Appx, A-7; A-13—A-32). In doing so, the District Court separately evaluated a few select facts as "true" or sufficiently proven by Plaintiff, and ignored numerous other facts it considered irrelevant or not detailed enough.[3] Thus, the District Court weighed what it believed would be ultimate facts instead of analyzing whether the amended complaint as a whole contains facts that made it reasonably foreseeable Cooper would harm Alisha. The amended complaint is replete with instances of Cooper's abuse of power and related sexual misconduct, verbal abuse, and violent temperament. Discovery in this case would surely reveal far more instances.

The District Court also improperly surmised that "[p]laintiff's characterization of Cooper's conduct appears to stem from hindsight." Appx, A-8. This misconception is based on the District Court's misperception that the facts alleged in the amended complaint were not known to the Defendants in 2012 (Appx, A-8). In fact, the Employers were aware of Cooper's sexual harassment, abuse, and violent conduct at the time it occurred and knew in 2012 of the specific instances alleged in the complaint. The sad facts of this case don't leave a reasonable person wondering *if* the Employers should have warned or protected Alisha from Cooper, but rather, *why* and *how* the Employers repeatedly failed to take any actions that would have protected her from Cooper's controlling grasp.

Worse, Home Depot mischaracterizes Cooper's workplace behavior as "non-violent." (Dkt#71, pp.5-6). But the Employers have not denied that they knew and were aware of Cooper's sexual harassment and that he was commanded to attend

[3] The District Court made it a point to identify when the allegations in the amended complaint did not include specific dates of each instance of abuse despite these acute details being insignificant, especially at the notice-pleading stage. Appx, A-5.

anger management. Home Depot downplays this in contending that murder was unforeseeable. (Dkt#71, p.6) In turn, the District Court similarly ruled that "[n]o duty exists unless the crime was reasonably foreseeable." Appx, A-8. But this narrow view is not on par with Illinois law. "[I]n order for liability to attach, it is not necessary that the exact method by which the injury occurred could have been expected. It is sufficient if some resulting injury could have been reasonably foreseen." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 442 (2006) (citing *Blue v. St. Clair Country Club,* 7 Ill.2d 359, 364 (1955)). Here, it was reasonably foreseeable that Cooper, who abused his employment power over women and was a known sexual harasser of Alisha as well as an angry-tempered man, would harm Alisha.

Ultimately, the District Court reviewed the amended complaint under the wrong standard by questioning whether the Plaintiff adduced facts to support a finding of liability. The high standard for granting a 12(b)(6) motion cannot be overstated. "Any district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain…' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005). This Court has held, "[a]ny decision declaring 'this complaint is deficient because it does not allege X' is a candidate for summary reversal, unless X is on the list in Fed.R.Civ.P. 9(b)." *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006). Here, the District Court wrongly required the amended complaint to allege Cooper had been physically violent to Alisha or threatened physical violence. Appx, A-8. No such pleading requirement exists under

Rule 8 of the Federal Rules of Civil Procedure. The amended complaint stated a claim for negligence, and the District Court's dismissal should be reversed.

**1. The District Court Improperly Decided Proximate Cause and Failed To Infer That The Employers Were Aware Of Cooper's "Clocking-In" Scheme To Be Alone With Alisha.**

The District Court inappropriately required Plaintiff to argue and prove proximate cause in the amended complaint. To establish a claim for negligence under Illinois law, a plaintiff must prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Reynolds v. CB Sports Bar, Inc.*, 623 F. 3rd 1143, 1148 (7th Cir. 2010). Whether a duty is owed under Illinois law is a question of law in a negligence action, the breach of duty and proximate cause are questions of fact. *Thompson v. Gordon*, 241 Ill.2d 428 (2011). Proximate cause is "preeminently an issue of fact to be decided by the jury." *Reynolds*, 623 F.3d at 1152; *quoting Rivera v. Garcia*, 401 Ill.App.3d 602 (2010). Duty and liability "are distinct concepts that must be separately considered." *LaFever v. Kemlite Co.*, 185 Ill.2d 380 (1998). Further, "proximate cause does not require that the defendant foresee the exact way in which an injury will occur." *Reynolds*, 623 F.3d at 1153; *quoting Hooper v. County of Cook*, 366 Ill.App.3d 1 (3d Dist. 2006).

The District Court improperly weighed the facts of whether the Employers should have known that Cooper's scheme to "clock in" Alisha while she traveled with him put Alisha at risk. Appx, A-9—A-10. Instead of inferring that Cooper's fraudulent scheme put Alisha at risk because she would appear to be at work, when in fact she was under Cooper's control, the District Court summarily dismissed these

facts. Appx, A-10. The Employers were negligently complicit in the "clocking in" scheme, which enabled Cooper to be alone with Alisha. Plaintiff pled that the Employers were aware of Cooper's practices and proclivities to use his authority over Alisha's employment to have access to her and occasions for intimacy, which would not occur absent the Employers' negligence. Appx, A-25, ¶64. The District Court erred in negating these facts, instead of viewing them in the light most favorable to Plaintiff. When these facts are viewed in the light most favorable to Plaintiff, the inference is that the Employers knew Cooper abused his authority to be alone with, and take advantage of Alisha. The "clocking in" scheme enabled an angry sexual harasser to be alone with a female subordinate, creating a risk of harm to her. The Employers negligently ignored and enabled Cooper's use of the "clocking in" scheme, instead of preventing it.

**2. The District Court Misapplied Cases That Ruled On The Existence Of A Duty In Dissimilar Circumstances.**

The District Court improperly dismissed the amended complaint, because it misapplied the law and held Plaintiff to a heightened pleading standard. Illinois case law should be applied in negligence claims in federal court, but it is only appropriate when evaluating substantive issues, not procedural thresholds. Here, Plaintiff was required to plead duty, breach, causation and damages, and she needed to meet only the notice pleading requirements of Rule 8(a), not Illinois' fact pleading requirement.

The first element a plaintiff must plead in a complaint alleging negligence is that the defendant owed plaintiff a duty. Determination of this element is a matter of law, left in the hands of the court. The District Court's memorandum opinion dismissing the amended complaint cites and applies four cases discussing "duty,"

each determining "duty" in four different stages of suit: *Simpkins v. CSX Transp. Inc.,* 965 N.E.2d 1092, 1099 (Ill. 2012) determined the sufficiency of alleging defendant owed plaintiff a duty under the procedural fact-pleading requirements applicable to a motion dismiss under 735 ILCS 5/2-615; *Lewis v. Razzberries, Inc*, 584 N.E.2d 437, 442 (Ill. App. Ct. 1991) evaluated whether a defendant owed plaintiff a duty at the summary judgment stage after discovery was taken; *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1148 (7th Cir. 2010) determined plaintiff's amended complaint sufficiently alleged defendant owed her a duty after an evidentiary hearing was held as to liability of the other named defendants, and testimony from said hearing was permitted in plaintiff's appeal against the dismissed defendant to establish duty; and *Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1184 (Ill. 2000) concerned the Illinois Supreme Court's reversal of the circuit and appellate court's entry of judgment on the jury verdict finding defendants owed plaintiff a duty (conducting the duty analysis at the final stage of litigation, after discovery was permitted…not at the pleading stage). Appx, A-8. In the present case, much unlike the foregoing cases, the District Court "stayed" discovery, and then proceeded to err in reviewing the amended complaint as if it contained all the facts necessary under Illinois fact-pleading standards, at summary judgment, after an evidentiary hearing, or after trial.

Here, the District Court's requirement to "sufficiently" allege that Cooper's attack on Alisha was more probable than merely conceivable contradicts the key distinction between notice and fact pleading. The District Court stated that the amended complaint "plausibly alleges that it was *conceivable* that Cooper would attack someone, given his history, but not that 'the circumstances [we]re such as to

put a reasonably prudent person on notice of the *probability* of an attack,' as is required for the element of foreseeability." Appx, A-8, quoting *Reynolds*, 623 F.3d 1143 at 1148 (emphases in original). However, the full quote in *Reynolds* clarifies that it applies to "a criminal attack by a third person": "A criminal attack by a third person is reasonably foreseeable when the circumstances are such as to put a reasonably prudent person on notice of the probability of an attack or when a serious physical altercation has already begun." *Reynolds*, 623 F.3d at 1148, quoting *Shortall v. Hawkeye's Bar & Grill*, 283 Ill.App.3d 439 (1st Dist. 1996). In the instant case, there are no third parties involved as both Alisha and Cooper were employees of Grand and Home Depot at all times. The probability of an attack was more certain.

The District Court also did not distinguish between facts making Cooper's attack on Alisha "conceivable" versus facts that would "put a person on notice of the probability of an attack [on her]." Appx, A-8. The totality of the facts alleged in the amended complaint, however, show Cooper had targeted Alisha (and other females) and that it was plausible that he was going to attack Alisha. Among other things, Cooper yelled and swore at Alisha (Appx, A-17, ¶¶22, 26); Cooper was cruel and violent towards Alisha (Appx, A-18, ¶31); Cooper slammed items around the store in fits of rage (Appx, A-18, ¶29); Cooper deprived Alisha of lunch breaks when she was "going to be accompanied by a male" (Appx, A-18, ¶33); and Cooper made explicit comments to Jessica and physically rubbed himself against her (Appx, A-16, ¶¶19-20). In light of the foregoing, one would expect that after Alisha begged not to be left alone with Cooper that the Employers would have immediately removed Cooper's

authority over Alisha, but instead the Employers steadfastly failed to lift a finger to help her.

Despite Plaintiff's detailed allegations of Cooper's abusive and violent conduct toward Alisha and female employees, the District Court concluded that because the amended complaint did not specifically allege that "Cooper had been physically violent to [Alisha] or anyone else prior to the murders or had threatened violence," (Appx, A-8) the amended complaint failed to put the Employers on notice that they had a duty to protect Alisha from harm. True, the amended complaint lacked full knowledge of Cooper's employment history, which might have shown physical violence toward Alisha and others. However, even without the benefit of discovery, the facts alleged show it is entirely plausible that Cooper might have engaged in physical altercations known to the Employers, for which they owed Alisha a duty of care.

Lastly, Cooper slammed objects around the store and exhibited such aggressive and abusive behavior at Alisha's workplace that a Home Depot manager had to send him home. The Employers further ordered Cooper to attend anger management classes. Again, the District Court found these allegations lacked facts showing it was "reasonably foreseeable" that Cooper would attack Alisha. Appx, A-8. But the Employers also knew Cooper sexually harassed employees, had improperly touched a female employee, in addition to knowing he had anger problems. They just did not care to do anything to protect Alisha. For every wrong, there is a remedy. The Employers were wrong in failing to remove Cooper's

authority over Alisha. The amended complaint contains facts showing the Employers owed Alisha a duty because it was likely Cooper would harm her.

### B. It Places No Additional Burden On Grand and Home Depot To Guard Employees Against An Abusive, Violent Co-Employee, and The Consequences Of Placing Such A Burden On Them Would Result In A Responsible Work Environment.

The Employers should have already known to remove a violent abusive supervisor from authority. The Employers likely already have work policies and procedures in place to prevent violence from one employee against another. If they do not, they should.

In *Reynolds*, this Court explained that the defendant bar had a duty to protect against "those criminal attacks occurring far from its physical premises that it *knew* would occur." *Reynolds*, 623 F.3d at 1152. Although the defendant did not have a duty to investigate the motives and conditions of its patrons, this Court determined the defendant could be held liable for "criminal designs of which it was actually aware." *Id*. The criminal attack of a third party must be reasonably foreseeable to impose a duty, and this Court reasoned that "it is not overly burdensome to require a bar to protect its invitees if it knows that one patron is intending to attack another patron, even if the attack is to occur far from the bar." *Id*.

Here, rather than requiring the Employers to protect business invitees if they know one invitee intends to attack another invitee, the relationship between the Employers and their employees is much closer than that between a bar and its patrons. While the Employers employed both Cooper and Alisha, they knew of Cooper's threatening and abusive conduct towards Alisha. Just as this Court found that it is not overly burdensome to impose a duty on a bar to protect its invitees from

criminal attacks if it knows that one patron is intending to attack another patron, even if the attack will occur far from the bar, it would not be overly burdensome to impose a duty on an employer to protect its employees from criminal attacks if it knows one employee is intending to attack another employee.

Plaintiff sufficiently alleged this element in her amended complaint by stating that the Employers knew or should have known Cooper was intending to attack Alisha (Appx, A-25, ¶64). In support of imposing this duty on the Employers, Plaintiff further alleged that the Employers were aware of Cooper's conduct towards Alisha throughout the scope of their employment (Appx, A-21, ¶44, A-22, ¶48, A-25, ¶64), Alisha had reported her discomfort and fear of Cooper to other members of the Home Depot and Grand management (Appx, A-19, ¶37, A-17, ¶27), and at least two fellow Grand and Home Depot employees knew that Cooper's aggressive and abusive conduct towards Alisha escalated once she became pregnant with another man's child (Appx, A-19, ¶36). Taking these allegations as true, Plaintiff met the federal notice pleading requirements and sufficiently alleged the Employers owed Alisha a duty to protect her from Cooper because the Employers knew or should have known that this terrible criminal attack would occur.

## II. The Employers Owed Alisha A Duty To Protect Her, Because They Knew That Cooper Would Attack Alisha By Luring Her From Work.

The Employers knew Cooper would do a sexually violent act to Alisha and that he was using his supervisory authority over Alisha's employment to have access and power over her. Appx, A-25, ¶64. "If a servant, while acting within the scope of his employment, comes into a position of imminent danger of serious harm and this is known to the master or to a person who has duties of management, the master is

subject to liability for a failure by himself or by such person to exercise reasonable care to avert the threatened harm." Restatement (Second) of Agency § 512(1) (1958); *see also Petersen v. U.S. Reduction Co.*, 641 N.E.2d 845, 849-50 (Ill. App. Ct. 1994).

Some Illinois courts have found that once an individual leaves an owner's premises, the owner ceases to owe the individual a duty to protect. However, Illinois courts have carved out exceptions to this general rule. For example, in *Osborne v. Stages Music Hall, Inc.*, the Illinois Supreme Court found a defendant nightclub liable for a criminal attack against one of its patrons that occurred on the sidewalk in front of the nightclub. *Osborne v. Stages Music Hall, Inc.*, 312 Ill. App. 3d 141, 149 (2000). In that case, during the night at issue, the nightclub's bouncers ejected two intoxicated men and shut the doors behind them. *Id.* at 143-44. The two men pounded on the doors and yelled profanities at the bouncers. *Id.* at 144. The plaintiff and a friend walked out of the club and onto the sidewalk in front of the club where the two drunk men were standing. *Id.* One of the men slapped the plaintiff's friend, and as the plaintiff ran to aid her friend one of the men kicked her in the face. *Id.* at 145.

In its duty analysis, the Illinois Appellate Court said that the reasonable foreseeability of the attack, and not whether the attack occurred on or off premises, was the dispositive factor for liability. *Id.* at 148. The *Osborne* court found evidence to support the conclusion that the attack was reasonably foreseeable since the bouncers had reason to know the two men outside the club were intoxicated and angry, they had already been involved in an argument and fight inside the club that night, and that they had not calmed down after being thrown out. *Id.* Despite the bouncers' knowledge of these facts, they did not remove the two men from the sidewalk or

otherwise supervise the area. Due to the bouncers' knowledge and their inaction to the circumstances, the court decided that "it was reasonably foreseeable that a patron would be attacked upon exiting the club and, therefore, it was incumbent on the club to guard against such an occurrence." *Id.* at 149.

The distance between the premises under a party's control and the location of a criminal attack does not preclude the imposition of a duty. As noted in *Reynolds v. CB Sports Bar, Inc.*, there is sparse Illinois case law discussing the impact distance from the premises has on extending liability. In *Reynolds*, the plaintiff alleged she was stranded at a bar (owned by defendant) after her car failed to start and was told by a bartender that the only way she should could get home was by getting a ride from someone at the bar. *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1145 (7th Cir. 2010). Two bar patrons bought plaintiff several drinks while sitting at the bar "in attempt to cause plaintiff to comply with their design to lure her to their apartment for sexual exploitation." *Id.* After the plaintiff and her attackers left the defendant's bar, plaintiff realized during the car ride that they were not driving towards her hotel and that the attackers intended to rape her, so she escaped from the car. She attempted to walk back to her hotel but wandered onto a highway on ramp and was struck by a car. The complaint in *Reynolds* included allegations imposing a duty on the defendant bar, stating it "knew or should have known that [plaintiff] would have tried to escape" and that the "had a duty to protect the welfare of its customers, including [plaintiff], from situations such as that being plotted by [defendant-attackers]". *Id.*

In *Reynolds*, this Court found that the complaint against the defendant-bar was broad enough to allege a viable theory of negligence, despite the attack taking place over a mile away from the premises. *Reynolds,* 623 F.3d at 1144. To determine whether the duty to protect the plaintiff extended beyond the bar's premises, this Court first determined whether the crime was "reasonably foreseeable – that is, that a reasonable person under the circumstances would have known that an attack would occur." *Id*. at 1150. Importantly, the focus of foreseeability was relative to "what the defendant knew at the time." *Id*. Plaintiff alleged that the defendant-bar "'at least knew or should have known that [the attackers] were getting [plaintiff] intoxicated for the purpose of sexual exploitation.'" *Id*. at 1151. Although plaintiff did not specifically state how she knew the defendant-bar knew the defendant attackers' criminal intentions, this Court assumed the allegations as true and concluded that "the subsequent unrealized criminal attack on [plaintiff] was reasonably foreseeable to [defendant bar]". *Id.*

In the instant case, the District Court should have applied this Court's reasoning in *Reynolds* to find that the amended complaint alleged a viable theory of negligence against the Employers, and that the Employers' duty to protect Alisha extended beyond their work premises. Both the District Court and this Court in *Reynolds* stated that foreseeability is based on "what the defendant knew at the time."Appx, A-8*; Reynolds*, 623 F.3d at 1150. Similarly, in the amended complaint, Plaintiff alleges that the Employers had knowledge of Cooper's violent and abusive conduct towards Alisha. A-19, ¶38, A20, ¶39, A-24, ¶60, p. A-25, ¶64. The amended complaint is replete with allegations specifying occasions when Cooper violently

threw and slammed things around the store (*Id.*); Cooper's verbal and abusive conduct calling Alisha a "bitch" (Appx, A-17, ¶26) a "slut" (Appx, A-19, ¶35), and a "whore" (*Id.*); Alisha reporting Cooper's inappropriate and abusive behavior to her Home Depot group leader, Kelly Elwell, begging her "[d]on't leave me with him" (Appx, A-17, ¶27). Similar to the pleadings in *Reynolds*, here the amended complaint alleged:

> That Cooper's practices and proclivities were well known to many employees and managers of GRAND and HOME DEPOT, particularly his pattern of abuse as it related to ALISHA, such that Defendants HOME DEPOT and GRAND knew, or it was reasonably foreseeable to HOME DEPOT and GRAND that BRIAN COOPER would do sexual violence to ALISHA, and that he was using his authority over her employment to have access to her and occasions for intimacy, and COOPER would have no such opportunity or occasion but for the negligence and complicity of Defendants, HOME DEPOT and GRAND.

Appx, A-25, ¶64.

But for Cooper's threats to fire Alisha and his "clocking in" scheme, Alisha would have been working instead of Cooper luring her away to her death. At this stage of litigation, Plaintiff was under no obligation to provide evidence or additional allegations explaining how she knows the Employers knew Cooper would do sexual violence to Alisha. The District Court erred in not taking these allegations as true. It should have concluded that a subsequent attack on Alisha was reasonably foreseeable to the Employers.

## III. Grand and Home Depot Knew That Cooper Was Unfit To Supervise Alisha, Which Put Her At Danger; The Amended Complaint Stated A Claim For Negligent Supervision.

The Employers' negligence in supervising their workplace and workforce created a foreseeable danger to Alisha. Under Illinois law, to "succeed in an action

for negligent supervision, the plaintiff must plead and prove that the employer knew or should have known that its employee had a particular unfitness for his position so as to create a danger of harm to third persons and the employer's failure to safeguard the plaintiff against this particular unfitness proximately caused the plaintiff's injury." *Platson v. NSM, Am., Inc.*, 322 Ill.App.3d 138, 144 (2d Dist. 2001); *see also Helfers-Beitz v. Degelman*, 406 Ill.App.3d 264, 270 (3d Dist. 2010); *Doe v. Brouillette*, 389 Ill.App.3d 595, 606 (1st Dist. 2009). A plaintiff successfully puts a defendant on notice of a negligent supervision claim by alleging that defendant employees, managers, and supervisors subjected plaintiff to abusive and violent conduct, that defendant knew or should have known about the conduct but retained the problematic employee and permitted the conduct, and that as a proximate cause the plaintiffs were harmed. *See Rapier v. Ford Motor Co.*, 49 F.Supp.2d 1078, 1080 (N.D. Ill. 1999).

Here, Plaintiff alleged that the Employers knew of Cooper's pattern of misconduct and violent tendencies against female subordinates (Appx, A-25, ¶64, A-27, ¶76) and accordingly knew or should have known that Cooper was unfit in his role as supervisor. Appx, A-26, ¶72, A-27, ¶76. The amended complaint explicitly alleges that the Employers "knew or should have known" that Cooper continuously engaged in abusive and violent misconduct towards Alisha. Appx, A-27, ¶76. As a result, Plaintiff stated a claim for negligent supervision against the Employers.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal of the amended complaint, and remand this case for trial.

Respectfully submitted,

By: /s/ Kristin Nicole Barnette

Kristin Nicole Barnette
**KRALOVEC, JAMBOIS & SCHWARTZ**
60 W. Randolph, 4th Floor
Chicago, IL 60601
(312) 782-2525
Fax: (312) 855-0068
Email: kbarnette@kjs-law.com

Jason M. Metnick
**MELTZER, PURTILL & STELLE LLC**
300 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 987-9900
jmetnick@mpslaw.com
*Attorneys for Sherry Anicich, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing Brief of Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 8,884 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in at least 12 point Calisto MT font.

s/ *Kristin Nicole Barnette*
Kristin Nicole Barnette

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are including in the Appendix.

s/ *Kristin Nicole Barnette*
Kristin Nicole Barnette

# CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2016, the Brief of Appellant was filed with the Clerk of the Circuit Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF System.

The following participant in the case is a registered CM/ECF user and will be served by the appellate CM/ECF system:

Jason M.Metnick
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 987-9900
jmetnick@mpslaw.com

s/ *Kristin Nicole Barnette*
Kristin Nicole Barnette

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order dated March 11, 2016.....................................A-1

Amended Complaint .............................................................................A-13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHERRY ANICICH, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 14 C 7125 |
| | ) | Judge Jorge L. Alonso |
| HOME DEPOT, U.S.A., INC.; GRAND SERVICE, LLC; and GRAND FLOWER GROWERS, INC., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the defendants' motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the Court grants the motions.

**BACKGROUND**

The Court dismissed the original complaint without prejudice pursuant to Rule 12(b)(6). *Anicich v. Home Depot, U.S.A., Inc.*, No. 14 C 7125, 2015 WL 3604734 (N.D. Ill. June 9, 2015). Plaintiff was given leave to amend, and she filed an amended complaint that pared down the number of defendants. The remaining defendants—Grand Service, LLC, Grand Flower Growers, Inc. (collectively, "Grand"), and Home Depot, U.S.A., Inc. ("Home Depot")—have filed motions to dismiss the amended complaint. The Court assumes that the reader is familiar with our earlier opinion, which discussed in detail the tragic facts of this case. *See id.* at *1-2.

Plaintiff's daughter, Alisha Bromfield, and her unborn child, Ava Lucille, were murdered by Brian Cooper, who was Bromfield's supervisor at work.[1] The murders occurred in August 2012 at a resort in Wisconsin. After Cooper and Bromfield attended the wedding of Cooper's sister in Door County, Cooper brought Bromfield back to the resort hotel room he had rented for them and suggested that they enter into a permanent relationship. When Bromfield declined, Cooper threatened her and her baby's life, strangled her for five minutes or more until she was dead, undressed her, and raped her corpse. (ECF No. 61, Am. Compl. ¶¶ 51, 53, 65.)

The amended complaint contains the same four counts as the original complaint: claims under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, for the wrongful deaths of Bromfield and Ava Lucille (Counts I and IV); a claim under the Illinois Survival Act, 755 ILCS 5/27-6, for Bromfield's pain and suffering prior to her death (Count II); and a claim for Bromfield's funeral and burial expenses (Count III).

## DISCUSSION

### A. Legal Standards

On a Rule 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts as true all well-pleaded facts in the complaint, and draws all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial

[1]The amended complaint alleges that Grand "provides certain seasonal personnel to Home Depot as well as grows, supplies, and then sets up and cares for the flowers and plants at garden centers located within Home Depot." (ECF No. 61, Am. Compl. ¶ 9.) It is alleged that Grand and Home Depot were the joint employers of Cooper and Bromfield. (*Id.* ¶¶ 9, 11, 14.)

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

**B. Allegations of the Original Complaint and the Court's Previous Opinion**

It is undisputed that all of plaintiff's claims were and are premised on defendants' negligence. The original complaint alleged that for more than five years, Cooper was Bromfield's supervisor at various Home Depot garden centers in northern Illinois (Compl. ¶¶ 6-7; was "abusive" to and "inappropriate . . . with" Bromfield on "business trips" in the region (it was not specified how or when) (*id.* ¶ 8); had "publicly decr[ied]" her as a "whore" and "slut" at an unspecified point in time, (*id.* ¶ 11); had "throw[n] items at employees" at an unspecified time (*id.* ¶ 11); was "open in suggesting an intimate relationship between himself" and Bromfield (*id.* ¶ 12); "was required [by Grand] to attend anger management therapy," which he failed to "satisfactorily complete" (*id.* ¶¶ 5, 14); and in 2012 "began to express anger" (it was not alleged to whom) "about [Bromfield]'s attending college and her personal life" (*id.* ¶ 15). It was not alleged that Cooper had been physically violent to Bromfield, threatened her with violence prior to the murder, or expressed to anyone any intention to attack her or that defendants knew that Cooper had previously been physically violent to anyone.

The Court held that because plaintiff failed to allege facts that plausibly suggested that Home Depot or Grand knew or should have known that Cooper was going to attack Bromfield, plaintiff failed to sufficiently allege that Home Depot and Grand owed Bromfield any duty, as is

required to state a claim for negligence.[2] *Anicich*, 2015 WL 3604734, at *3-6. Even assuming that the harm was reasonably foreseeable, plaintiff had also failed to plead facts that favored imposing a duty on the defendants under the remaining factors in the duty analysis under Illinois law. *Id.* at *6. The Court rejected plaintiff's arguments that she had stated negligence claims under two exceptions to the general rule that there is no affirmative duty to protect another from the criminal acts of a third person (when an employee is in imminent danger and this is known to the employer, and when there is negligence in the performance of a voluntary undertaking). *Id.* at *7-8. The Court also rejected plaintiff's argument that she had stated a claim for negligent supervision. *Id.* at *9.

## C. Allegations of the Amended Complaint

In addition to the allegation that Grand and Home Depot were the "joint employers" of Cooper and Bromfield, plaintiff has added the following material factual allegations to the

---

[2]To state a claim for negligence under Illinois law, plaintiff must plead that the defendants owed plaintiff a duty, they breached that duty, and the breach proximately caused plaintiff's injury. *See Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1096 (Ill. 2012). "Whether a duty is owed is a question of law for the court to decide, while breach and proximate cause are factual matters for the jury." *Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007). "While persons generally have no duty to protect against dangers created by third parties, they do have a duty to protect against harms created by their own conduct." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 515 (7th Cir. 2010) (citing Illinois law). If it is sufficiently alleged that the defendant contributed to the risk of harm to the plaintiff, the court weighs four factors to determine whether a duty ran from the defendant to the plaintiff: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden on the defendant." *Simpkins*, 965 N.E.2d at 1098. If the answer to the "threshold question" as to the contribution to risk is no, the court should examine whether there are any "special relationships" that may give rise to a duty to aid or protect another from an unreasonable risk of harm. *Id.*

amended complaint.[3] Beginning in 2007, Cooper was the supervisor of a "young female employee" named Jessica who had begun working at the Joliet Home Depot store after completing high school. (Am. Compl. ¶ 18.) Cooper engaged in "inappropriate conduct toward" her by "making references to his penis," falsely introducing Jessica as his girlfriend, and "physically rubbing himself against Jessica." (*Id.* ¶¶ 19-20.) Jessica told Kelly Elwell, a "group leader"[4] at the Joliet store, about Cooper's "misconduct" and that it made her feel uncomfortable, and Elwell said that other coworkers had made similar complaints about Cooper and even Elwell felt uncomfortable around him. (*Id.* ¶ 21.) Over time, Jessica became "increasingly apprehensive" about her work environment due to Cooper's "increasingly loud and abusive" conduct in that he would "yell and swear" at her around customers. (*Id.* ¶ 22.) When Jessica quit working at Home Depot, she told Cooper over the phone to avoid telling him in person, and he swore and yelled at her. (*Id.* ¶ 23.) It is not alleged when any of these events occurred.

On at least two unspecified occasions, Cooper similarly called Bromfield a "bitch" within earshot of customers and employees. (*Id.* ¶ 26.) Bromfield was scared of Cooper, told Elwell not to "leave [her] with him," and complained that Cooper had referred to her as his girlfriend. (*Id.* ¶ 27.) At some point, management personnel at Home Depot's Joliet store sent Cooper home from work after he "slamm[ed] items around the store in fits of rage." (*Id.* ¶ 29.)

At the Shorewood Home Depot store on an unspecified date when the temperature was over 100 degrees, Bromfield asked Cooper for a break. (*Id.* ¶ 32.) He denied her request, and

---

[3]Some of these facts were included in the original complaint but are further developed in the amended complaint.

[4]The amended complaint does not explain the role of a "group leader" or whether this position entailed any supervisory authority.

when a manager named Tina Clem saw that Bromfield was upset and crying, she told Cooper that Bromfield needed a break. (*Id.* ¶ 33.) Sometimes, Cooper would not allow Bromfield to take a lunch break, including times when she "was going to be accompanied by a male." (*Id.*) On one occasion when Bromfield asked Cooper for a day off, he called her a "slut" and a "whore" within earshot of customers and employees. (*Id.* ¶ 34.) As a result of this conduct, Mark Hanouw, the store manager, told Clem to send Cooper home. (*Id.* ¶ 35.) As Cooper was leaving work, he continued to yell at Bromfield and another female employee and sent them text messages later that evening. (*Id.*) After Cooper learned that Bromfield was pregnant with another man's child, Clem "witnessed Cooper stewing angrily in the patio section," and she thought that Cooper's "demeanor toward" Bromfield "changed." (*Id.* ¶ 36.)

Cooper repeatedly called and sent text messages to Bromfield under the false pretense of discussing work-related matters, in order to "intimidate" her, "monitor her life outside of work," and invite her to spend time alone with him. (*Id.* ¶ 38.) Bromfield "continuously decline[d] and reject[ed] these unwelcomed advances" and complained on multiple occasions "about this harassment to Grand management, including the group leader at Home Depot Shorewood, and specifically requested not to be alone with [Cooper]," but despite these complaints, defendants' management "simply told" Bromfield that "they were already aware of Cooper's anger problems." (*Id.* ¶¶ 38-39.) Defendants failed to require Cooper to complete anger-management classes after Grand had "superficially" asked Cooper to take them. (*Id.* ¶¶ 41-42.)

Grand and Home Depot knew that Cooper took Bromfield "on day trips" to various Home Depot stores, "allegedly for work purposes," during which he "engaged in [unspecified] abusive and inappropriate conduct with" Bromfield, "and one time required that they sleep in the same room." (*Id.* ¶ 46.) It is not alleged that anyone at Grand or Home Depot knew about the

latter fact, but that "Grand's business records from that trip would make it obvious that Cooper only had one (1) room booked for two employees." (*Id.* ¶ 47.)

Cooper asked Bromfield at least twice to accompany him to his sister's wedding in Wisconsin, and she refused. (*Id.* ¶ 49.) Thereafter, Cooper told her that he would reduce her work hours or fire her if she did not go with him. (*Id.* ¶ 50.) Bromfield went with him to the wedding on Friday, August 18, 2012. (*Id.* ¶ 51.) It is alleged on information and belief that while they were in Wisconsin, "Cooper arranged for [Bromfield] to be clocked in by a team leader of Grand, which can be accomplished only by using a Home Depot" landline telephone located on Home Depot's premises, so that Bromfield would be paid as if she had gone to work that day. (*Id.* ¶ 52.)

**D. Defendants' Motions to Dismiss the Amended Complaint**

Defendants contend that the additional allegations about defendants' awareness of Cooper's unprofessional conduct, sexual harassment of Bromfield and another employee, and "clocking-in" scheme still do not permit a reasonable inference that Cooper's attack on Bromfield was reasonably foreseeable. The Court agrees. Viewing the amended complaint in the light most favorable to the plaintiff, it can be inferred that defendants knew that Cooper had sexually harassed and verbally abused Bromfield and another female employee, had angrily thrown items in the store, and had failed to complete an anger management course that he had been directed to complete. Given these allegations, which are taken as true for purposes of the instant motions, the Court finds it surprising and regrettable that Cooper was still employed as a

regional manager, or employed at all, in 2012.[5] Nevertheless, although plaintiff frequently cites "violent" behavior of which defendants were allegedly aware, it is not alleged that Cooper had been physically violent to Bromfield or anyone else prior to the murders or had threatened violence. Plaintiff's characterization of Cooper's conduct appears to stem from hindsight. What is considered reasonably foreseeable, however, depends not on hindsight, but on what information was known to defendants in 2012. *See Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1099 (Ill. 2012); *Lewis v. Razzberries, Inc.*, 584 N.E.2d 437, 442 (Ill. App. Ct. 1991). Plaintiff contends wholly without support in the allegations that "Grand and Home Depot . . . knew of the *imminent harm* to [Bromfield] and did nothing to stop it." (ECF No. 73, Pl.'s Resp. at 11 (emphasis added).) The amended complaint plausibly alleges that it was *conceivable* that Cooper would attack someone, given his history, but not that "the circumstances [we]re such as to put a reasonably prudent person on notice of the *probability* of an attack," as is required for the element of foreseeability. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1148 (7th Cir. 2010) (emphasis added); *Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1184 (Ill. 2000). No duty can exist unless the crime was reasonably foreseeable, which the amended complaint fails to sufficiently allege.

Even when a defendant has not created or contributed to a risk of harm and thus assumed a duty to protect against injury that flows from that course of action, Illinois courts have recognized that a duty to take affirmative action to protect another may arise in other instances. *Anicich*, 2015 WL 3604734, at *6-8 (citing cases). Plaintiff invokes two provisions of the

---

[5]Home Depot's characterization of Cooper's behavior in the workplace as his having "ma[d]e a few mistakes" (ECF No. 75, Home Depot's Reply at 13), strikes the Court as cavalier.

Restatement (Second) of Agency, §§ 512(1) and 471. The Court discussed § 512(1) in its previous opinion. That provision states: "If a servant, while acting within the scope of his employment, comes into a position of imminent danger of serious harm and this is known to the master or to a person who has duties of management, the master is subject to liability for a failure by himself or by such person to exercise reasonable care to avert the threatened harm." Restatement (Second) of Agency § 512(1) (1958); *see also Petersen v. U.S. Reduction Co.*, 641 N.E.2d 845, 849-50 (Ill. App. Ct. 1994). The Court previously rejected plaintiff's contention that the facts of this case fit within this exception. *Anicich*, 2015 WL 3604734, at *7 ("Cooper and Bromfield were far from defendants' premises during the attack; moreover, plaintiff has not alleged even an inchoate threat, and in any event no facts from which it can be reasonably inferred that, defendants knew that Bromfield was in a position of *imminent* danger."). These facts have not changed. In an attempt to fit the allegations into the "acting within the scope of employment" factor, plaintiff argues that Bromfield "was 'on the clock' at the time of her death" (Pl.'s Resp. at 11), but ignores the fact that even according to the complaint, that was false and Bromfield was not working.

Section 471 of the Restatement provides that a "principal is subject to liability in an action of tort for failing to use care to warn an agent of an unreasonable risk involved in the employment, if the principal should realize that it exists and that the agent is likely not to become aware of it, thereby suffering harm." Restatement (Second) of Agency § 471 (1958); *see also Iseberg v. Gross*, 879 N.E.2d 278, 285-88 (Ill. 2007). Plaintiff has failed to state a claim under this theory. Plaintiff asserts that "[d]efendants failed to warn [Bromfield] of the risk of obeying Cooper while she was 'clocked in' under his control," (Pl.'s Resp. 11-12), but as discussed above, plaintiff does not allege facts from which it can be reasonably inferred that

defendants should have realized that Bromfield was at risk of being physically attacked by Cooper, or had superior knowledge of that risk. It is also doubtful that the risk was "involved in the employment" as Illinois courts construe that requirement. *See, e.g.*, *Iseberg*, 879 N.E.2d at 287-88; *MacDonald v. Hinton*, 836 N.E.2d 893, 900-01 (Ill. App. Ct. 2005) (stating that "if the act is not related to the employer's business, it cannot serve as a basis for employer liability" and "for the risk to be 'involved in the employment,' it must arise from the particular nature of the employment").

Plaintiff also again maintains that she has stated a claim for negligent supervision because she has alleged that defendants "knew of [Cooper's] pattern of misconduct and violent tendencies." (Pl.'s Resp. at 13.) The Court disagrees. To "'succeed in an action for negligent supervision, the plaintiff must plead and prove that the employer knew or should have known that its employee had a particular unfitness for his position so as to create a danger of harm to third persons and that the employer's failure to safeguard the plaintiff against this particular unfitness proximately caused the plaintiff's injury.'" *Hasbun v. United States*, 941 F. Supp. 2d 1011, 1015 (N.D. Ill. 2013) (quoting *Platson v. NSM, Am., Inc.*, 748 N.E.2d 1278, 1284 (Ill. App. Ct. 2001)). "[T]he particular unfitness of the employee must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Platson*, 748 N.E.2d at 1284 (citing *Van Horne v. Muller*, 705 N.E.2d 898, 906 (Ill. 1998)). As discussed above, however, there are no allegations of a prior pattern of violence from which it can be inferred that Cooper's attack was reasonably foreseeable to defendants.

It remains the case that there is no Illinois decision that recognizes an employer's duty in circumstances like, or even remotely similar to, those presented here. Because plaintiff has

failed to plausibly allege a claim for negligent supervision or that the defendants had a duty to protect Bromfield from Cooper's criminal conduct, the amended complaint is dismissed.

Home Depot seeks a with-prejudice dismissal. (ECF No. 69, Home Depot's Mot. at 3; ECF No. 71, Home Depot's Mem. Supp. Mot. at 16.) Plaintiff does not respond to the "with prejudice" request and does not seek leave to amend in the event of dismissal. Presumably, the plaintiff set out in the amended complaint all of the facts available to her in an effort to address the deficiencies discussed in the Court's prior opinion, so the Court is dubious that plaintiff will be able to file an amended pleading that states a claim. If plaintiff believes that she can file a second amended complaint consistent with the Court's opinions and Rule 11, she may file by April 1, 2016 a motion seeking leave to do so. The Court will therefore dismiss the amended complaint without prejudice at this juncture. If plaintiff does not file a timely motion or it appears from the motion that amendment would be futile, the Court will dismiss this suit with prejudice.

**CONCLUSION**

The motions of Grand Service, LLC, Grand Flower Growers, Inc., and Home Depot, U.S.A., Inc. to dismiss the amended complaint [67, 69] are granted. The amended complaint is dismissed without prejudice, and plaintiff is given until April 1, 2016 to file a motion seeking leave to file a second amended complaint (and attaching the proposed second amended complaint). If plaintiff fails to do so, the Court will dismiss this action with prejudice.

**SO ORDERED.** **ENTERED: March 11, 2016**

**JORGE L. ALONSO**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHERRY ANICICH,** Independent Administrator of the Estate of **ALISHA BROMFIELD,** Deceased, and as Special Administrator of the Estate of **BABY AVA LUCILLE,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 14-CV-07125 |
| **HOME DEPOT U.S.A., INC. d/b/a HOME DEPOT, JOHN MOSSEL,** and **TODD MOSSEL,** each individually and each d/b/a **GRAND SERVICE, LLC.,** and each d/b/a **GRAND FLOWER GROWERS, INC.,** and each d/b/a **VINCA SOLUTIONS, LLC.,** | ) | Judge Jorge Alonso |
| Defendants. | ) | |

## AMENDED COMPLAINT

**NOW COMES** the Plaintiff, **SHERRY ANICICH,** as Independent Administrator of the Estate of **ALISHA BROMFIELD,** deceased, and as Special Administrator for the Estate of **BABY AVA LUCILLE**, by and through her attorneys, **KRALOVEC, JAMBOIS & SCHWARTZ**, and for her Amended Complaint against Defendants, **HOME DEPOT U.S.A., INC.**, **GRAND SERVICE, LLC.,** and **GRAND FLOWER GROWERS, INC.**, states as follows:

## THE PARTIES

1. Plaintiff, **SHERRY ANICICH**, is the mother of **ALISHA BROMFIELD**, who died on August 19, 2012, and has been duly appointed the Independent Administrator of the Estate of **ALISHA BROMFIELD**, deceased, by the Circuit Court of Will County, Probate Division, evidencing her right and standing to sue, and brings this action in that capacity.

2. Plaintiff, **SHERRY ANICICH**, was and is a resident of Plainfield, Illinois at all times relevant hereto.

3. **GRAND SERVICE, LLC**, is a Michigan limited liability company with its principal place of business in Michigan.

4. **GRAND FLOWER GROWERS, INC**. is a Michigan corporation, which operates in tandem with **GRAND SERVICE, LLC** throughout Illinois as joint employers with **HOME DEPOT U.S.A., INC. ("HOME DEPOT").**

5. **HOME DEPOT** is a Delaware corporation, which is registered as a foreign business to conduct business in Illinois. Home Depot has more than 29 business locations in Cook County, Illinois.

6. **VINCA SOLUTIONS, LLC** is an Indiana limited liability company with its principal place of business in Michigan.

## <u>JURISDICTION AND VENUE</u>

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) since the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00 and is between citizens of different states. Defendant **GRAND SERVICE, LLC** removed this action from Illinois state court, and this Court ruled on May 7, 2015 that diversity jurisdiction was properly alleged.

8. Venue is proper pursuant to 28 U.S.C. §1391.

## <u>FACTS COMMON TO ALL COUNTS</u>

9. **GRAND FLOWER GROWERS, INC.** and **GRAND SERVICE, LLC** (collectively, "**GRAND**") as business partners and joint employers with **HOME DEPOT**,

provides certain seasonal personnel to **HOME DEPOT** as well as grows, supplies, and then sets up and cares for the flowers and plants at garden centers located within **HOME DEPOT.**

10. **GRAND** pays said personnel via **VINCA SOLUTIONS, LLC**.

11. At all times relevant hereto, **BRIAN COOPER** (**"COOPER"**) was a resident of Illinois, and was the Regional Manager of **GRAND**. In that capacity, **COOPER** was also jointly employed by **HOME DEPOT**, and managed employees who were jointly employed by **GRAND** and **HOME DEPOT**.

12. **COOPER** reported to the top managers of the Home Depot stores covered by the region assigned to him, which among others, included stores located in Joliet, Illinois and Shorewood, Illinois.

13. As Regional Manager for **GRAND**, **COOPER** was in charge of **GRAND's** business operations and employees at **HOME DEPOT** garden center facilities throughout Northern Illinois, including hiring and firing all "merchandisers" and "team leaders," and hiring Plaintiff's decedent, **ALISHA BROMFIELD**, as "merchandiser" in 2006, up until August 19, 2012. Upon being hired, **ALISHA** was placed under **COOPER's** supervision and control.

14. In 2006 **ALISHA**, then a teenager, began working for **GRAND** and **HOME DEPOT**, receiving her paychecks from **VINCA**, performing **HOME DEPOT** merchandiser tasks, assisting **HOME DEPOT** customers, providing **HOME DEPOT** garden services, tending to **HOME DEPOT** flowers, and setting up **HOME DEPOT** displays and **HOME DEPOT** price signs at **HOME DEPOT** locations including those locations in Shorewood, Bolingbrook and Joliet. **ALISHA** continued to work seasonally for **GRAND** and **HOME DEPOT** until the time of her death in August of 2012.

15. While **ALISHA** worked for **GRAND** and **HOME DEPOT**, and was paid by **VINCA** performing services exclusively for **GRAND** and **HOME DEPOT**, **ALISHA** would wear an orange apron with the **HOME DEPOT** logo and an orange hat with the **HOME DEPOT** logo, in addition to transporting and displaying **HOME DEPOT** signs in her car.

16. During the time that **ALISHA** worked for **GRAND** at **HOME DEPOT** garden centers, **HOME DEPOT** controlled who it hired and retained, and was in charge of the garden center and overall job site safety for work being performed there.

**Home Depot Joliet**

17. At all relevant times, the group leader at **HOME DEPOT** in Joliet, Illinois ("Home Depot Joliet") was an individual named Kelly Elwell. During the time that Alisha worked at **HOME DEPOT** Joliet, Kelly became aware of **COOPER**'s inappropriate conduct toward young women and violent behavior.

18. Beginning in 2007, **COOPER** had supervisory authority over a certain young female employee named Jessica (Watts) Boseo. Jessica began working at **HOME DEPOT** Joliet after she completed high school.

19. **COOPER** engaged in inappropriate conduct toward Jessica on numerous instances, including but not limited to: making references to his penis, introducing Jessica as his girlfriend, and physically rubbing himself against Jessica.

20. For example, on one occasion, **COOPER** told Jessica that she was to accompany him and other female employees to other **HOME DEPOT** locations. When she got into his car, **BRIAN COOPER** did not pick up any other employees and instead drove straight to downtown Chicago while making explicit comments about his genitals. Once they arrived in Chicago,

**COOPER** introduced Jessica as his girlfriend despite Jessica's disgust and protests to the incorrect label.

21. When Jessica informed Kelly of **COOPER**'s misconduct and how uncomfortable it made her feel, Kelly told Jessica that other co-workers had made similar complaints of **COOPER**, and that even she (Kelly) felt uncomfortable working around **COOPER**.

22. Over time, Jessica became increasingly apprehensive about the work environment at **HOME DEPOT** Joliet, because **COOPER's** conduct at **HOME DEPOT** Joliet had become increasingly loud and abusive. **COOPER** would yell and swear at Jessica while at **HOME DEPOT** Joliet such that customers could hear and observe his conduct.

23. Jessica quit working at **HOME DEPOT** and was too afraid of **COOPER's** potentially explosive reaction to tell **COOPER** in person, so she told him over the phone. In response, **COOPER** became belligerent, and swore and yelled at Jessica.

24. **COOPER's** threatening and sexually harassing conduct at **HOME DEPOT** Joliet was open, obvious, and known to Kelly Elwell and others at **GRAND** and **HOME DEPOT**.

25. **COOPER's** conduct toward **ALISHA** at **HOME DEPOT** Joliet was similarly threatening and sexually harassing.

26. On at least two occasions, **COOPER** called **ALISHA** a "bitch" within earshot of other **HOME DEPOT** customers and employees at **HOME DEPOT** Joliet.

27. **ALISHA** felt threatened by and scared of **COOPER**, and told Kelly at **HOME DEPOT** Joliet "Don't leave me with him." **ALISHA** also complained to Kelly that **COOPER** called her his girlfriend.

28. Instead of removing **COOPER's** supervisory authority over **ALISHA**, or placing **ALISHA** in a role that would give her a different supervisor, or separating work hours to remove

**ALISHA** from **COOPER**'s direct supervision and control, **COOPER** was permitted to continue to supervise and control **ALISHA**'s work conditions, including her employment status.

29. **COOPER** was sent home from work by **HOME DEPOT** management at **HOME DEPOT** Joliet for slamming items around the store in fits of rage.

30. Nonetheless, at no time was **COOPER** removed from supervising **ALISHA** and controlling her work conditions at **HOME DEPOT** Joliet, including his ability to terminate **ALISHA**'s employment.

**Home Depot Shorewood**

31. At all relevant times, a manager at **HOME DEPOT** in Shorewood, Illinois ("Home Depot Shorewood") was an individual named Tina Clem. During the time that **ALISHA** worked at **HOME DEPOT** Shorewood, Tina became aware of **COOPER's** inappropriate conduct, including cruel and violent behavior toward **ALISHA**.

32. At **HOME DEPOT** Shorewood, **ALISHA** asked **COOPER** for a break when temperatures exceeded 100 degrees. **COOPER** denied **ALISHA's** request for a break during such conditions.

33. Tina observed **ALISHA** crying and visibly upset when **COOPER** denied **ALISHA** her request for a break, and then Tina told **COOPER** that **ALISHA** needed a break. **COOPER** would also not permit **ALISHA** to take a lunch break on certain occasions, including when **ALISHA** was going to be accompanied by a male for her lunch break.

34. On one occasion, **COOPER** called **ALISHA** a "slut" and a "whore" at **HOME DEPOT** Shorewood when **ALISHA** asked him for a day off. **COOPER** yelled these statements where they could be heard by **HOME DEPOT** employees and customers.

35. Mark Hanouw, Store Manager at **HOME DEPOT** Shorewood, directed Tina Clem to send **COOPER** home as a result of his conduct towards **ALISHA** in calling her a "slut" and a "whore." Then as **COOPER** was leaving work, he continued to yell at **ALISHA** and another female employee, and then continued to send them text messages later that evening.

36. It became apparent to Tina that **COOPER's** demeanor toward **ALISHA** changed when **COOPER** learned that **ALISHA** was pregnant with another man's child. Tina witnessed **COOPER** stewing angrily in the patio section when he learned **ALISHA** was pregnant. It was also evident to **ALISHA's** co-employee at **HOME DEPOT** Shorewood that **COOPER's** treatment toward **ALISHA** constituted sexual harassment.

**Alisha Complains to Grand**

37. **COOPER's** conduct was an ongoing and regular part of the work conditions at **HOME DEPOT** Joliet and **HOME DEPOT** Shorewood. **ALISHA** complained to **GRAND** management about **COOPER**'s conduct on multiple occasions, and that he was open in suggesting an intimate relationship between himself and **ALISHA,** based upon the time he was able to be with her because of his work supervision.

38. **COOPER** would repeatedly text message, call, and otherwise contact **ALISHA**, under the false pretense of a "work related" issue in order to intimidate **ALISHA** to respond to his communications and to monitor her life outside of work and invite **ALISHA** to spend time alone with him. **ALISHA** would continuously decline and reject these unwelcomed advances and complained about this harassment to **GRAND** management, including the group leader at **HOME DEPOT** Shorewood, and specifically requested not to be alone with him. Despite these complaints and reports, **GRAND** and **HOME DEPOT** management failed to follow through with any meaningful actions to protect **ALISHA**.

39. In fact, when **ALISHA** complained to **GRAND** management about **BRIAN COOPER's** aggressive conduct and unwelcomed advances on multiple occasions, **GRAND** management and **HOME DEPOT** management simply told **ALISHA** they were already aware of **COOPER's** anger problems. Despite admitting to their knowledge of **BRIAN COOPER's** past and ongoing anger problems and violent propensities, including throwing and slamming items in the garden center and **HOME DEPOT** parking lot while screaming obscenities at **ALISHA**, neither **GRAND** management nor **HOME DEPOT** management did anything to save **ALISHA** from **COOPER's** conduct.

40. Not only was no action was taken by Defendants to investigate, monitor, limit or control **COOPER** in his interactions with **ALISHA**, but employees and other unknown representatives at **GRAND** and **HOME DEPOT** actually cooperated and assisted **COOPER** to be alone with **ALISHA** to facilitate his continuing pattern of abuse. Those persons arranged to have **ALISHA's** work attendance clocked in and out while **ALISHA** was traveling with **COOPER**, at his demand.

**Grand directs Cooper to undertake anger management, but fails to take any steps to remove Cooper's supervisory authority over Alisha.**

41. In response to **COOPER's** actions at **HOME DEPOT** Joliet and **HOME DEPOT** Shorewood, and instead of terminating **COOPER** or removing any of his authority over **ALISHA** or over other female employees, **GRAND** superficially asked **COOPER** to undertake anger management classes. **HOME DEPOT**, as co-employer of **COOPER**, was equally involved in the management of **COOPER**, and **HOME DEPOT's** management knew of **COOPER**'s anger issues.

42. **COOPER** was ordered to complete an anger management course, but did not comply, and when **COOPER** had a confrontation with his human resources manager about being required to attend anger management, it resulted in **COOPER** being ordered to attend additional anger management. **GRAND** and **HOME DEPOT** failed to require **COOPER** to complete anger management classes, or to ensure that there had been any progress in the management of his behavior and anger towards **ALISHA** and other employees, but instead simply ignored the issue. **GRAND's** human resource records would establish the details of this protective undertaking and **COOPER's** related failed completion of anger management counseling.

43. Regardless, **GRAND** willfully disregarded any requirement for **COOPER** to complete anger management counseling and permitted **COOPER** to continue as a supervisor over young female employees, including **ALISHA**.

44. **GRAND** and **HOME DEPOT**, through their agents, supervisors, and others were very likely aware, or minimally should have been aware **COOPER** had dangerous anger propensities and psychological issues.

45. Yet, at all relevant times, **GRAND** and **HOME DEPOT** continued to permit **COOPER** to retain supervisory authority over **ALISHA's** working hours, working conditions, and unfettered discretion to terminate **ALISHA** at will.

46. Moreover, **GRAND** and **HOME DEPOT** knew that **COOPER** took **ALISHA** on day trips to other **HOME DEPOT** stores, allegedly for work purposes. **COOPER** demanded that **ALISHA** accompany him on such "business trips" to different **HOME DEPOT** garden center locations he was regional manager of in Cook County, Illinois and elsewhere, during which he engaged in abusive and inappropriate conduct with **ALISHA**, and one time required that they sleep in the same room.

47. **GRAND's** business records from that trip would make it obvious that **COOPER** only had one (1) room booked for two employees.

48. Both **GRAND** and **HOME DEPOT** never took any actions to limit **COOPER's** ability to interact with and control **ALISHA's** employment conditions, as well as her continued employment.

**Cooper requires Alisha to go to his sister's wedding as a condition of future employment, then kills her**

49. **COOPER** asked **ALISHA** at least two times to go to his sister's wedding with him, which **ALISHA** refused to do.

50. Thereafter, **COOPER** told **ALISHA** that he would take reduce her work hours and/or fire her from her job if she did not go to his sister's wedding with him.

51. Thus, **COOPER** coerced **ALISHA** not to go to work on Friday, August 18, 2012, but instead to accompany him to the wedding, which was to take place in Door County, Wisconsin.

52. On information and belief, it is alleged that while **ALISHA** was in Wisconsin with **COOPER** just prior to her death, **COOPER** arranged for **ALISHA** to be clocked in by a team leader of **GRAND**, which can be accomplished only by using a **HOME DEPOT** "land-line" telephone located on **HOME DEPOT** premises, so that **ALISHA** would be paid as an employee of **GRAND** and **HOME DEPOT** through **VINCA**, which would be proven by the business records of **VINCA, GRAND** and **HOME DEPOT.** In other words, the business records of **GRAND** and **HOME DEPOT** would show that at about the same time **COOPER** was killing **ALISHA**, she was being counted as working for **GRAND** and **HOME DEPOT**.

53. At the wedding, **COOPER** introduced **ALISHA** to various members of his family and, after the ceremony in which his sister was wed, he brought her back to the resort

hotel room he had rented for them. There he continued his pattern of verbal and physical abuse, and suggested that they enter into a permanent relationship, and when she declined, he threatened her if she did not submit to him, and then, as she begged for her life and that of her unborn child, he strangled her for five minutes or more until she was dead, and thereafter, undressed her and raped her corpse.

54. At the time of the foregoing, **ALISHA** was nearly seven months pregnant, and the fetus (**BABY AVA LUCILLE**) was viable and alive, but died as a result of her mother's murder and rape.

**<u>COUNT I</u>**
**Wrongful Death**

55. Plaintiff restates and re-alleges paragraphs 1 through 54 of the Amended Complaint as though fully alleged herein.

56. Defendants **HOME DEPOT** and **GRAND** had a duty to use reasonable care to protect its employees, including **ALISHA BROMFIELD**, from a dangerous co-employee and supervisor, **BRIAN COOPER**.

57. Defendants **HOME DEPOT** and **GRAND** had a duty to select an employee who was competent and fit to perform the duties required as an employee, and would not use his authority to intimidate and terrorize young girls placed under his supervision, and would require them to accompany him various **HOME DEPOT** locations throughout the Cook and Will Counties.

58. Defendants **HOME DEPOT** and **GRAND** owed **ALISHA BROMFIELD** a duty to supervise, maintain, operate and monitor the condition of **HOME DEPOT** garden centers

premises as well as the conduct of its employees, including co-employees so as to not cause injury or damage to others.

59. That, by appointing, empowering or endorsing **BRIAN COOPER**, as a Regional Manager with responsibility over their Northern Illinois operations directly managing 50-60 employees, **HOME DEPOT** and **GRAND** placed **BRIAN COOPER** in a position of power, control and authority over young female employees, including **ALISHA**.

60. That at the time the Defendants, **HOME DEPOT** and **GRAND**, retained and promoted **BRIAN COOPER**, he was known to be dangerous, sexually harassing, and intimidating to employees he supervised, making him unfit to serve in his supervisory capacity as Regional Manager or in a supervisory position, which information was known by or, in the exercise of reasonable care, should have been known by Defendants, **HOME DEPOT** and **GRAND**.

61. That the unfitness of **BRIAN COOPER** to serve as Regional Manager and supervisor over teenagers and young women hired to work in the **HOME DEPOT** garden centers in Northern Illinois created a reasonably foreseeable risk of danger to the public and the decedent, including risk of injury, serious bodily harm, and clearly death.

62. That, by allowing **BRIAN COOPER** unfettered authority to select and retain the employees he hired to work at the **HOME DEPOT** garden centers, and given the authority to allocate of the number of hours an employee would or would not work at the **HOME DEPOT** garden centers, **HOME DEPOT** and **GRAND** placed **BRIAN COOPER** in a position of power and authority over young female employees, including **ALISHA**.

63. That by virtue of his authority as Regional Manager, and his control over the unchecked authority in the selection and retention of the employees he hired to work at the

**HOME DEPOT** garden centers, and the allocation of the number of hours an employee would or would not work at the **HOME DEPOT** garden centers, **BRIAN COOPER** required, coerced, manipulated and intimidated **ALISHA** into accompanying him to **HOME DEPOT** locations throughout, among others, Cook County, where he continued to intimidate, sexually harass and abuse teenage garden workers, including **ALISHA.**

64. That **COOPER's** practices and proclivities were well known to many employees and managers of **GRAND** and **HOME DEPOT**, particularly his pattern of abuse as it related to **ALISHA**, such that Defendants **HOME DEPOT** and **GRAND** knew, or it was reasonably foreseeable to **HOME DEPOT** and **GRAND** that **BRIAN COOPER** would do sexual violence to **ALISHA**, and that he was using his authority over her employment to have access to her and occasions for intimacy, and **COOPER** would have no such opportunity or occasion but for the negligence and complicity of Defendants, **HOME DEPOT** and **GRAND**.

65. As a proximate result of Defendants **HOME DEPOT's** and **GRAND's** negligence and retention of **BRIAN COOPER**, **ALISHA BROMFIELD** was manipulated, abused, tormented, threatened and bullied by **COOPER** during her employment until her death to August 19, 2012, which culminated with her being subjected to a death threat to her and her unborn child and actually suffered a lengthy strangulation before she died.

66. Plaintiff is the duly appointed Independent Administrator of the Estate of **ALISHA BROMFIELD**, Deceased, and brings this cause of action pursuant to the Wrongful Death Act, 740 ILCS 180/1 *et seq.*

67. **ALISHA BROMFIELD**, Deceased, left surviving her, **SHERRY ANICICH**, her mother, Jim Heisner, her father, and her siblings Luke Anicich, Breonna Anicich, Chase Heisner, and Colton Heisner, who have suffered severe and permanent damages and pecuniary

loss including the loss of love, support, guidance, affection companionship and society as a result of the premature death of **ALISHA BROMFIELD**.

**WHEREFORE**, Plaintiff, **SHERRY ANICICH**, Independent Administrator of the Estate of **ALISHA BROMFIELD**, Deceased, demands judgment against Defendants, and each of them, for an amount in excess of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00).

**COUNT II**
**Survival**

68. Plaintiff restates and re-alleges paragraphs 1 through 54 of the Amended Complaint as though fully alleged herein.

69. Defendants **HOME DEPOT** and **GRAND** had a duty to use reasonable care to select an employee who was competent and fit to perform the duties required as an employee, and would not use his authority to intimidate and terrorize young girls placed under his supervision, and whose duties required them to accompany him various **HOME DEPOT** locations throughout the Cook and Will Counties.

70. Defendants **HOME DEPOT** and **GRAND** owed **ALISHA BROMFIELD** a duty to supervise, maintain, operate and monitor the condition of **HOME DEPOT** garden centers premises as well as the conduct of its employees, agents or joint venturers present so as to not cause injury or damage to others.

71. That, by appointing, empowering or endorsing **BRIAN COOPER**, as a Regional Manager over their Northern Illinois operations, **HOME DEPOT** and **GRAND** placed him in a position of power, control and authority over young female employees, including **ALISHA**.

72. That at the time the Defendants, **HOME DEPOT** and **GRAND**, retained and promoted **BRIAN COOPER**, he was unfit to serve in his supervisory capacity as Regional

Manager, which information was known by or, in the exercise of reasonable care, should have been known by Defendants, **HOME DEPOT** and **GRAND**.

73. That the unfitness of **BRIAN COOPER** to serve as Regional Manager and supervisor over teenagers and young women hired to work in the **HOME DEPOT** garden centers in Northern Illinois created a reasonably foreseeable risk of danger to the public and the decedent, including risk of injury, serious bodily harm, and clearly death.

74. That, by allowing **BRIAN COOPER** unchecked authority in selection and retention of the employees he hired to work at the **HOME DEPOT** garden centers, and the allocation of the number of hours an employee would or would not work at the **HOME DEPOT** garden centers, **HOME DEPOT** and **GRAND** placed **BRIAN COOPER** in a position of power and authority over young female employees, including **ALISHA**.

75. That by virtue of his authority as Regional Manager, and his control over the unchecked authority in selection and retention of the employees he hired to work at the **HOME DEPOT** garden centers, and the allocation of the number of hours an employee would or would not work at the **HOME DEPOT** garden centers, **BRIAN COOPER** required, coerced, manipulated and intimidated **ALISHA** into accompanying him to **HOME DEPOT** locations throughout, among others, Cook County, where he continued to intimate and abuse teenage garden workers, including **ALISHA**,

76. That **COOPER's** practices and proclivities were well known to many other employees of **GRAND** and **HOME DEPOT**, particularly his pattern of abuse as it related to **ALISHA**, such that Defendants **HOME DEPOT** and **GRAND** knew or it was reasonably foreseeable that **HOME DEPOT** and **GRAND** that **BRIAN COOPER** would do sexual violence to **ALISHA**, and that he was using his authority over her employment to have access to

her and occasions for intimacy, and **COOPER** would have no such opportunity or occasion but for the negligence and complicity of Defendants, **HOME DEPOT** and **GRAND**.

77. As a proximate result of Defendants **HOME DEPOT's** and **GRAND's** negligence and retention of **BRIAN COOPER**, **ALISHA BROMFIELD** was abused, tormented, threatened and bullied by **COOPER** for a long time prior to August 19, 2012, which culminated with her being subjected to a death threat to her and her unborn child and actually suffered a lengthy strangulation before she died.

78. As a proximate result of one or more of the aforesaid negligent acts and/or omissions of Defendants and each of them, **ALISHA** sustained injuries of a personal and pecuniary nature, including conscious pain and suffering prior to her death on August 19, 2012, and had she survived, she would have been entitled to bring this action for damages, and this action survives her; and such an action has survived her and accrued to the benefit of her heirs at law, to wit, **SHERRY ANICICH**, her mother, Jim Heisner, her father, and her siblings Luke Anicich, Breonna Anicich, Chase Heisner, and Colton Heisner.

79. That Plaintiff is the duly appointed Independent Administrator of the Estate of **ALISHA BROMFIELD**, Deceased, and bring this action pursuant to the Survival Act, 755 ILCS 5/27-6, *et seq*.

**WHEREFORE**, the Plaintiff, **SHERRY ANICICH**, as Independent Administrator of the Estate of **ALISHA BROMFIELD**, demands judgment against Defendants, and each of them, for an amount in excess of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00).

**COUNT III**
**Funeral & Burial Expenses**

80. Plaintiff restates and re-alleges paragraphs 1 through 54 of the Amended Complaint as though fully alleged herein.

81. That as a direct and proximate result of one or more of the foregoing careless and negligent acts and/or omissions on the part of the Defendants, **HOME DEPOT** and **GRAND**, the Plaintiff, **SHERRY ANICICH**, became liable for the funeral and burial expenses of the decedent, **ALISHA BROMFIELD**, which were incurred by the Estate of **ALISHA BROMFIELD**.

**WHEREFORE**, the Plaintiff, **SHERRY ANICICH**, as Independent Administrator of the Estate of **ALISHA BROMSFIELD**, deceased, demands judgment against Defendants, and each of them, in such amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for the injuries, losses, and damages hereinabove alleged.

**COUNT IV**
**Wrongful Death (BABY AVA LUCILLE)**

82. Plaintiff restates and re-alleges paragraphs 1 through 54 of the Amended Complaint as though fully alleged herein.

83. That **ALISHA** began working for **GRAND** as a teenager performing merchandiser tasks providing garden services and tending to flowers, and setting up displays and price signs in Illinois **HOME DEPOT** locations including Shorewood, Bolingbrook and Joliet, and continued to work seasonally until the time of her death.

84. That at the time of her death, **ALISHA** was nearly 7 months pregnant with **BABY AVA LUCILLE**.

85. That during the time that **ALISHA** worked for **GRAND** at **HOME DEPOT** garden centers, **HOME DEPOT** controlled who it hired and retained, and was in charge of the garden center and overall job site safety for work being performed there.

86. Defendants **HOME DEPOT** and **GRAND** had a duty to use reasonable care to select an employee who was competent and fit to perform the duties required as an employee, and would not use his authority to intimidate and terrorize young girls placed under his supervision.

87. That at the time the Defendants, **HOME DEPOT** and **GRAND**, retained and promoted **BRIAN COOPER**, he was unfit to serve in his supervisory capacity as Regional Manager, which information was known by or, in the exercise of reasonable care, should have been known by Defendants, **HOME DEPOT** and **GRAND**.

88. That, by appointing, empowering or endorsing **BRIAN COOPER**, to the supervisory position as a Regional Manager over their Northern Illinois operations, **HOME DEPOT** and **GRAND** placed him in a position of power, control and authority over young female employees, including **ALISHA**, who was pregnant with Plaintiff's Decedent, **BABY AVA LUCILLE**.

89. That at the time of the matters complained of, **GRAND**, through their agents, supervisors, and others were aware or should have been aware that **BRIAN COOPER** had psychological issues and dangerous propensities, had failed to complete anger management counseling in which **GRAND** had demanded that he participate, in spite of which he was allowed to continue in their employ as a supervisor over young female employees, including **ALISHA**, who was nearly 7 months pregnant on August 19, 2012.

90. That **COOPER's** practices and proclivities were well known to many other employees of **GRAND** and **HOME DEPOT**, particularly his pattern of abuse as it related to **ALISHA**, such that Defendants **HOME DEPOT** and **GRAND** knew or it was reasonably foreseeable that **BRIAN COOPER** would do sexual violence to **ALISHA**, and that he was using his authority over her employment to have access to her and occasions for intimacy, and **COOPER** would have no such opportunity or occasion but for the negligence and complicity of Defendants, **HOME DEPOT** and **GRAND**.

91. That a proximate result of the foregoing acts of negligent retention and supervision of the Defendants, **HOME DEPOT** and **GRAND, ALISHA BROMFIELD** and **BABY AVA LUCILLE** were killed.

92. That but for the actions hereinabove complained of, **BABY AVA LUCILE** would have been born alive and Plaintiff, **SHERRY ANICICH**, would have been her grandmother, but who now instead suffers severe and permanent damages and pecuniary loss including the loss of love, support, guidance, affection and companionship and society as a result of the premature death of **BABY AVA LUCILLE**.

93. That Plaintiff, **SHERRY ANICICH**, as Special Administrator of the Estate of **BABY AVA LUCILLE**, brings her action in Count IV under the provisions of the Wrongful Death Act, 740 ILCS 180/1 *et seq.*as the surviving grandmother of the decedent, **BABY AVA LUCILLE**, a viable fetus, who died intestate, *en ventre sa mere*, on August 19, 2012.

**WHEREFORE**, the Plaintiff, **SHERRY ANICICH**, as Special Administrator of **BABY AVA LUCILLE,** and grandmother of decedent's unborn daughter, **BABY AVA LUCILLE**, demands judgment against the Defendants, and each of them, in such amount in excess of this

Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for the injuries, losses, and damages hereinabove alleged.

PLAINTIFF DEMANDS A TRIAL BY JURY

**Sherry Anicich, Independent Administrator of the Estate of Alisha Bromfield, Deceased, and as Special Administrator of the Estate of Baby Ava Lucille**

By: /s/ Kristin N. Barnette
One of Her Attorneys

William D. Maddux
Kristin N. Barnette
**KRALOVEC, JAMBOIS & SCHWARTZ**
Attorneys for the Plaintiff
60 West Randolph, 4th Floor
Chicago, Illinois 60601
(312)782-2525

Jason M. Metnick
**MELTZER, PURTILL & STELLE LLC**
300 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 987-9900
jmetnick@mpslaw.com